**William R. DUTTON, Plaintiff,**

v.

**JOHNSON COUNTY BOARD OF COUNTY COMMISSIONERS, Defendant.**

**Civ. A. No. 93–2184–GTV.**

United States District Court, D. Kansas.

July 20, 1994.

---

**500**

Alan P. Blinzler, Overland Park, KS, for plaintiff.

LeeAnne Hays Gillaspie, Mary Martin Buhl, Johnson County Legal Dept., Olathe, KS, for defendant.

### MEMORANDUM AND ORDER

VAN BEBBER, District Judge.

This is a disability discrimination action brought under the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 791 *et seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* Plaintiff, a former employee of the defendant county, alleges that the county violated these statutes by terminating his employment and failing to offer reasonable accommodation for his disabling condition. The case comes before the court on defendant's motion for summary judgment (Doc. 41). For the reasons outlined below, the motion is denied.[1]

---

**1.** Defendant requested oral argument on its motion pursuant to D.Kan.Rule 206(d). After reviewing the briefs and other material submitted by the parties in connection with this motion, the court has determined that oral argument would not materially assist the court, and therefore defendant's request is denied.

## I. Facts

The following factual summary is based on the parties' statement of uncontroverted facts submitted in connection with the summary judgment motion. Those material facts which are controverted and supported by deposition testimony or other evidence are stated in the light most favorable to the plaintiff, the non-moving party.

Plaintiff began working for Johnson County Public Works in October, 1979, and his employment was terminated on August 18, 1992. During the time he was employed by the county, plaintiff worked as a laborer, truck driver, and equipment operator. He was an equipment operator for approximately five years immediately preceding his termination. His job duties as an equipment operator included operating heavy equipment such as oil distributors, grade-alls (used for digging ditches), rubber tire rollers, steel wheel rollers, road graders, street sweepers, track loaders, bulldozers, and dump trucks, in the course of performing road maintenance.

Plaintiff claims that he is disabled because he suffers from migraine headaches. He began experiencing headaches in 1971 while still in the military, and his headaches have not changed significantly in quantity or quality since then. The headaches are a physiological disorder affecting plaintiff's neurological and cardiovascular systems. In 1974, plaintiff obtained a 10% disability rating from the Veterans Administration ("VA") because of his headaches. The VA reevaluated and changed that rating twice. In 1979, the rating was increased to 30%, but in 1988 it was reduced back to 10%. Plaintiff is unaware of any connection between engaging in work activities and the onset of the headaches. He states that the triggering events are unknown.

Plaintiff was terminated from employment due to absenteeism. His termination was based solely on his unexcused absences and not as a result of any deficiency in the quality of his work. When at work, he performed his job in a satisfactory manner.

During the period 1979 through 1989 there was no significant change in plaintiff's sick leave pattern. Plaintiff used an average of approximately 102 hours per year in sick leave during the period 1983 through 1989. In 1990 he used 101 hours, in 1991 he used 96 hours, and in 1992 he used 64 hours up until his termination in August. Plaintiff also used an average of approximately 116 hours per year vacation time during the period 1983 through 1991. In 1992, plaintiff used 88 vacation hours prior to his termination.

In November, 1989, the Director of Public Works, James Pilley, issued a new policy that required employees to schedule vacation time in advance, and to provide a doctor's statement if sick leave usage exceeded certain amounts. The policy provided that vacation or personal holidays for which the employee gave inadequate notice would be treated as unscheduled leave, and that such unscheduled leave could affect an employee's appraisal rating. In defining the advance notice required, the policy stated that employees requesting more than four vacation days must give at least seven days notice. For one to four vacation days, the employee's supervisor was to determine if the leave request is scheduled or unscheduled based on whether the notice was adequate to accommodate the employee's absence. In implementing this policy, supervisors in the department have apparently required that employees give at least 3 days notice, except for emergencies, of any use of vacation time.

Some changes were made after Bob Henry, in November, 1989, was made superintendent of road maintenance, the section within the public works department which employed plaintiff. One change involved the method of assigning work. Road crew members previously did not receive their work assignments until some time after they reported for work, after the foremen knew what personnel would be on duty that day. Mr. Henry changed the procedure so that the employees would receive their assignments as soon as they reported for work at 8:00 a.m. Employees requesting sick or other emergency leave were required to call in between 7:45 and 8:00 a.m.

Beginning in 1989, employees were required to execute leave request forms for all time off work. These forms asked for the

reason the employee was taking the leave. Plaintiff's leave request forms for 1989 through August, 1992 show that he was absent due to illness a total of 539.75 hours, or about 67 work days. Out of this total, plaintiff was absent a total of 235.75 hours, or about 29 work days, due to headaches. The absences due to illness occurred on 76 separate days, 55% of which were Mondays or Fridays. Of the days that plaintiff was absent due to headaches, 63% were on Mondays or Fridays.

Plaintiff was first reprimanded for his absenteeism in 1989, in conjunction with his annual performance appraisal. Phil Yauger, Bob Henry's predecessor, delayed plaintiff's raise that year due to his absenteeism. Plaintiff provided Mr. Yauger with a note from plaintiff's treating physician who indicated that he had treated plaintiff since 1983 for severe headaches, that the headaches had been treated with codeine, and that skull and spine x-rays were negative. In July, 1990, plaintiff's annual appraisal indicated that he had used 90.5 hours sick leave and 40 unscheduled hours in the previous year. The supervisor again advised plaintiff that he should reduce the number of sick leave hours used.

Plaintiff had been allowed to use vacation time to cover absences due to illness when he had exhausted his sick leave. Beginning in approximately May, 1991, however, plaintiff was put on leave without pay (LWOP) for such absences. Plaintiff filed a grievance on May 20, 1991, in which he sought "recognition" of his disability and pay for the LWOP hours he was charged. After holding a grievance hearing, Mr. Pilley issued a decision directing that plaintiff be paid for the hours charged to LWOP, but upholding the department's policy and requiring that plaintiff's future vacation time requests be made in advance. Mr. Pilley also advised plaintiff that the department had inadequate documentation of plaintiff's alleged disability. In response, plaintiff provided additional doctor notes in approximately August, 1991.

Plaintiff's next annual performance appraisal, in July, 1991, again addressed absenteeism. Plaintiff was given a "provisional" rating for the job factor titled "Attendance and Punctuality." The appraisal contains a notation that plaintiff had used 81 hours sick leave and 75 hours unscheduled leave. Plaintiff was given a performance improvement plan which identified the problem as excessive sick leave and unscheduled leave, and which encouraged plaintiff to reduce his leave usage. The plan was to run for three months. Plaintiff was denied his salary increase.

After the expiration of the 90–day period, on October 21, 1991, plaintiff was again given a performance appraisal. This appraisal noted no improvement in attendance and stated that in the three-month period plaintiff had used 28 hours of sick leave, 13 hours unscheduled leave, and 9 hours LWOP. The performance improvement plan was continued for another 90 days.

No improvement occurred during this 90–day period, and on February 4, 1992, plaintiff was given a "first warning" which required a doctor's excuse for all sick leave used and prohibited the use of any LWOP or unscheduled time. Plaintiff filed a grievance, a grievance hearing was held, and Mr. Pilley responded on February 24, 1992, by declining to modify the first warning. Plaintiff appealed this decision to the county administrator, E.H. Denton. Mr. Denton held a grievance hearing and asked whether plaintiff would be interested in a part-time schedule to accommodate his frequent absences. Plaintiff declined this offer and restated his position that he should be able to use his vacation time to cover absences due to illness when his sick leave was exhausted.

Mr. Denton denied plaintiff's proposed relief in a decision dated March 23, 1992, in which he found that the department had a reasonable expectation to minimize unscheduled absences in order to increase efficiency. He found that plaintiff's unscheduled leave usage was excessive, and noted that the first warning indicated other problems, including tardiness and failure to call in absences timely.

During the next 90–day period plaintiff used 28 hours sick leave and 52 hours LWOP, which included 40.25 unscheduled hours. As a result, plaintiff was issued a

"second warning" on May 4, 1992. The second warning contained the same recommended remedy: to improve within the next 90 days.

The next annual performance appraisal was given to plaintiff on August 3, 1992, and he again received a "provisional" rating in the attendance and punctuality job factor, and was again denied a salary increase. On August 11, 1992, Mr. Pilley met with plaintiff in a pre-disciplinary conference during which Mr. Pilley offered plaintiff the option of working a "flexible schedule." Under the proposed flexible schedule, plaintiff and his supervisor would schedule plaintiff's work week in advance of the start of the week. Plaintiff would still be responsible for adhering to this schedule. Plaintiff declined the offer because his headaches were unpredictable, and Mr. Pilley advised plaintiff that he intended to terminate his employment on August 18, 1992.

Plaintiff requested a due process hearing before the Board of County Commissioners, and this hearing was held on August 17, 1992. Plaintiff again requested that he be allowed to use any accrued vacation time for unscheduled absences due to illness, and he again declined the offer of a flexible prescheduled 40 hour work week. The Board did not agree to plaintiff's request, and he was terminated from employment effective August 18, 1992.

After plaintiff was terminated, he applied for and received unemployment benefits. In the course of applying for benefits, plaintiff stated that he was able to work and that there were no impediments to his being continuously employed. From May to July, 1993, plaintiff worked part-time as a driver for a company that disposed of medical wastes. Plaintiff did not miss any work while he held this job. This is the only job plaintiff has held since his termination from the county.

As stated previously, there were no significant changes in plaintiff's sick leave usage during the time that he worked for the county. In recent years, however, the county identified a need to operate in a more efficient manner. In this connection, the county's public works department examined its employee attendance policies and made changes designed to increase efficiency.

Mr. Pilley, plaintiff's supervisor, testified in a deposition that the three-day advance notice rule was needed in order to provide uniformity so that employees knew what was expected. He testified that although unscheduled absences created scheduling problems within the department, he could not identify specific work that was not completed timely due to plaintiff's absences. Likewise, Mr. Henry in his deposition testimony could not identify any particular job that plaintiff's absence prevented the county from completing in a timely manner. Mr. Henry did testify, however, that there were times that crews were idle and schedules were disrupted due to plaintiff's absences. No estimate of cost to the county could be provided.

Plaintiff was one of 6 equipment operators and 9 senior equipment operators within the public works department. Plaintiff usually worked with a crew. Plaintiff was not essential to the operations of the department, but when he was absent someone else had to be assigned to do the work he would have done. Generally, other employees were available to do this work, but the county had no additional employees solely for this purpose.

Plaintiff testified that the frequency and intensity of his headaches has not changed over time. He stated that some headaches were more severe than others and that the severe headaches were usually accompanied by nausea. His headaches prevent him from driving and limit his ability to engage in social activities.

## II. Legal Standards

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be discharged by "showing," that is, pointing out to the district court, that there is an absence of evidence to

support the non-moving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, "a party opposing ... may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Id.*

### III. Analysis

#### A. Statutory Scheme

■ Plaintiff has brought this action under both the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 *et seq.,* and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* The statutes are similar but contain some differences. The primary difference involves the types of employers covered. The Rehabilitation Act applies to federal government agencies, federal contractors, and entities receiving federal funding. 29 U.S.C. §§ 791, 794. In contrast, the ADA applies to all employers with 25 or more employees effective July 26, 1992. 42 U.S.C. § 12111(5)(A).

■ Defendant has not objected to the assertion in plaintiff's complaint that defendant is potentially covered under both statutes, and the court makes no specific finding in this regard. For purposes of this summary judgment motion, the court perceives of no practical distinction between the statutes. While some of the terminology may differ, for purposes of this motion the prima facie case and available defenses are the same. *See Chandler v. City of Dallas,* 2 F.3d 1385, 1391 (5th Cir.1993). In passing the ADA, Congress specifically intended that the case law established under the Rehabilitation Act be used in deciding cases brought under the ADA. *See* 42 U.S.C. § 12117(b); *EEOC v. AIC Sec. Investigation, Ltd.,* 820 F.Supp. 1060, 1064 (N.D.Ill.1993). In accordance with the manner in which the parties have briefed the issues, the court will analyze the arguments using the applicable ADA provisions and terminology with Rehabilitation Act case law as the interpretative basis.

The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual ..." 42 U.S.C. § 12112(a). Employers are prohibited from discriminating against such individuals with regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A).

A disability is "(A) a physical or mental impairment that substantially limits one or more of the life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions" of the job. 42 U.S.C. § 12111(8). The ADA does not specifically define "reasonable accommodation," but the term is described in a definition section in terms of examples which include making facilities readily accessible to disabled individuals, job restructuring, part-time or modified work schedules, modified equipment or devices, etc. 42 U.S.C. § 12111(9). The employer's duty to provide reasonable accommodations does not extend, however, to accommodations that "would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

■ Plaintiff has the burden to establish that he is "disabled" and "qualified" to perform the essential functions of the job either with or without reasonable accommodation. *See Pushkin v. Regents of University of Colorado,* 658 F.2d 1372, 1385 (10th Cir.1981).

The burden is then on the defendant to either rebut those claims or establish that the reasonable accommodation required would create an undue hardship. In order to prevail on its summary judgment motion, the defendant must establish either that: (1) plaintiff is not disabled within the meaning of the statute; (2) plaintiff is not qualified to perform the essential functions of the job; or (3) the only possible reasonable accommodations would create an undue hardship on defendant.

In this case, plaintiff claims that he is disabled but qualified to perform the essential functions of the job with reasonable accommodation. According to plaintiff, the only effective accommodation the defendant can provide is to modify defendant's policy regarding the use of unscheduled leave and allow plaintiff to use vacation time for unscheduled absences due to illness when he has exhausted his sick leave. Plaintiff asserts that this accommodation is reasonable. Defendant claims that plaintiff is not disabled within the meaning of the statute. Defendant further asserts that even if plaintiff is disabled, he is not a "qualified individual" because his absenteeism prevents him from performing his job's essential functions. Finally, defendant argues that the accommodation requested by plaintiff is unreasonable and would cause an undue hardship.

While the issues of whether plaintiff is a qualified individual and whether the accommodation is reasonable are conceptually separate ones, they nevertheless are interrelated. As previously stated, a "qualified individual with a disability" is one who "with or without reasonable accommodation," can perform the essential functions of the job. 42 U.S.C. § 12111(8). Plaintiff concedes that he requires some form of accommodation in order to perform the essential functions of his job. Under these circumstances, the basic question is whether any reasonable accommodation would allow plaintiff to perform the essential functions of his job without creating an undue hardship on the defendant.

In analyzing defendant's summary judgment motion, the court will first address the question of whether plaintiff is disabled within the meaning of the statute and then the issues related to the reasonable accommodation question.

### B. Plaintiff's Disability

Plaintiff claims that he is disabled by reason of "a physical or mental impairment that substantially limits one or more of [his] life activities." 42 U.S.C. § 12102(2). The regulations define "physical or mental impairment" as "[a]ny physiological disorder, or condition" affecting one or more of various body systems, including the cardiovascular system. 29 C.F.R. § 1630.2(h)(1). "Major life activities" are the basic activities that the average person can perform with little or no difficulty, e.g., "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

"Substantially limits" means either the inability to perform a major life activity, or a severe restriction on the ability to perform a major life activity as compared to the general population. 29 C.F.R. § 1630.2(j)(1). Three factors to consider in determining whether a person's impairment substantially limits a major life activity are: (1) its nature and severity, (2) how long it will last or is expected to last, and (3) its permanent or long term impact, or expected impact. 29 C.F.R. § 1630.2(j)(2).

■ An individual is substantially limited in working if the impairment restricts the person's ability to perform either a class of jobs or a broad range of jobs in various classes. An impairment that limits an individual's ability to perform only one job fails the test of substantial limitation in working. *Welsh v. City of Tulsa,* 977 F.2d 1415, 1419 (10th Cir.1992); *Byrne v. Board of Education,* 979 F.2d 560, 565 (7th Cir.1992); *Maulding v. Sullivan,* 961 F.2d 694, 698 (8th Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993); *Daley v. Koch,* 892 F.2d 212, 214–16 (2d Cir.1989). In addition to the factors listed above, the following should be considered when determining whether an individual is substantially limited in working: (1) the type of job from which the individual has been disqualified because of the impairment; (2) the number

and types of jobs within that area from which the individual is disqualified; (3) the number and types of jobs using similar training, knowledge, skill, or abilities from which the individual is disqualified; and (4) the number and types of other jobs in the area from which the individual is also disqualified. 29 C.F.R. § 1630.2(j).

■ The evidence shows that plaintiff's migraine headaches constitute a physiological disorder which affects his neurological and cardiovascular systems. The only issue is whether this impairment substantially limits one or more of his major life activities. The court finds the evidence creates a genuine issue of material fact which precludes a finding that plaintiff is not disabled.

Plaintiff has presented evidence to show that his headaches are severe and debilitating when they occur. The headaches, while not lasting a long period of time, comprise a permanent, or long-term condition in that plaintiff has experienced them intermittently for over 20 years. When he suffers a headache, plaintiff is unable to drive or carry on most normal, everyday tasks that an unimpaired individual is able to do. Plaintiff's limitation on major life activities includes that of working. There is no evidence to connect plaintiff's headaches with a particular type of work. The evidence shows that his headaches cause him to miss work at a rate that would limit his ability to perform any type of job.

Defendant does not contest plaintiff's allegations regarding the debilitating nature of his headaches, but defendant argues that the headaches do not substantially limit any major life activities because they occur relatively infrequently. Defendant points to the evidence which shows that during the period from the beginning of 1989 until plaintiff was discharged in August, 1992, plaintiff missed on average less than 10 work days per year due to headaches.

■ The frequency that plaintiff is forced to miss work due to his impairment is not a determinative factor in finding that he is substantially limited in a major life activity. *See Mantolete v. Bolger,* 767 F.2d 1416 (9th Cir.1985) (epileptic considered handicapped individual under Rehabilitation Act even though she averaged only one daytime grand mal seizure per year and partial seizures lasting a few moments only once every two or three weeks). The evidence in this case shows that plaintiff's headaches contributed significantly to the absenteeism for which he was dismissed. Plaintiff's status as a disabled individual is a highly fact-sensitive issue, requiring an individualized inquiry and case-by-case determination. *Byrne,* 979 F.2d at 565 (citing *United States v. Southern Management Corp.,* 955 F.2d 914, 918 (4th Cir.1992). Defendant has not established the absence of genuine issues of material fact to show that plaintiff is not disabled.

*C. Reasonable Accommodation*

■ To prevail on his claim, plaintiff must prove that he is a "qualified individual" with a disability. As stated earlier, defendant admits that plaintiff is qualified to perform the job when he is present, and was terminated solely because of excessive absenteeism. Likewise, plaintiff acknowledges that he is qualified for the job only if he receives reasonable accommodation in the form of an exception to defendant's leave policies. The question of whether plaintiff is a "qualified individual" is therefore intertwined with the reasonable accommodation question. The remaining issue therefore is whether any reasonable accommodation would allow plaintiff to perform the essential functions of his job without creating an undue hardship on defendant.

■ An employer who fails to provide reasonable accommodation to the known physical or mental limitations of a qualified individual with a disability commits unlawful discrimination unless the accommodation can be shown to impose undue hardship. 42 U.S.C. § 12112(b)(5)(A). Examples of accommodation include making facilities accessible, restructuring a job, altering when and how an essential job function is performed, providing for part-time or modified work schedules, obtaining or modifying equipment or devices, modifying examination, training materials or policies, and reassigning to a vacant position. 29 C.F.R. § 1630.2(*o* )(2).

Employers are not required to provide accommodations that "would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). "Undue hardship" is defined as "an action requiring significant difficulty or expense," when considered in light of certain factors. 42 U.S.C. § 12111(10)(A). Those factors include the nature and cost of the accommodation, the overall financial resources of the employer and number of persons employed, the type of operation, and the overall impact on the operation of a facility. 42 U.S.C. § 12111(10)(B).

Plaintiff has requested that defendant accommodate his disability by allowing him to use vacation time for unscheduled absences due to illness when he has exhausted his available sick leave.[2] Defendant contends that this accommodation is both unreasonable and one that would impose an undue burden on defendant. Defendant further claims that the accommodations it offered to plaintiff—a part-time work schedule or flexible pre-scheduled full-time schedule—were effective accommodations that fulfilled defendant's obligations under the ADA. The court determines that defendant has not established that plaintiff's proposed accommodation is unreasonable or that it would impose an undue hardship. Defendant has further failed to establish that the accommodations it offered to plaintiff would have been effective in enabling plaintiff to reduce his absenteeism and perform his essential job functions.

For an accommodation to be reasonable, it must be effective in permitting a disabled worker to perform the essential job functions. The evidence shows that the accommodation proposed by plaintiff would be effective. Plaintiff performs his job satisfactorily when he is at work. Defendant terminated plaintiff's employment solely due to plaintiff's excessive use of unscheduled leave.

If defendant were willing to accept plaintiff's use of unscheduled leave by allowing him to use his vacation time, then plaintiff would be able to successfully perform the essential functions of his job.

Defendant argues, however, that an essential part of any job is the requirement of reasonably regular and predictable attendance. A number of cases decided under the Rehabilitation Act would appear to support this proposition. *See Carr v. Reno*, 23 F.3d 525 (D.C.Cir.1994) (affirming district court's holding that plaintiff's prolonged, frequent, and unpredictable absences render her unqualified for any government job); *Walders v. Garrett*, 765 F.Supp. 303, 310 (E.D.Va. 1991) (noting that plaintiff's job "clearly required regular, predictable attendance"), *aff'd*, 956 F.2d 1163 (4th Cir.1992); *Santiago v. Temple Univ.*, 739 F.Supp. 974, 979 (E.D.Pa.1990) (Where plaintiff "has demonstrated an apparent inability to attend work with any degree of predictability," plaintiff cannot be accommodated.), *aff'd*, 928 F.2d 396 (3d Cir.1991); *Matzo v. Postmaster Gen.*, 685 F.Supp. 260, 263 (D.D.C.1987) (employee who missed several months of work not "otherwise qualified"), *aff'd*, 861 F.2d 1290 (D.C.Cir.1988); *LeMere v. Burnley*, 683 F.Supp. 275, 280 (D.D.C.1988) ("The Plaintiff's unscheduled absences prevented her from following a regular work schedule under which she could 'perform the essential functions' of her position."); *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D.Tenn.1986) (rejecting plaintiff's claim that employer failed to accommodate need for treatment by requiring that absences be scheduled and supported by adequate documentation), *aff'd*, 831 F.2d 298 (6th Cir.1987).

The facts in those cases, however, can be distinguished from those in the case at bar. These differences include both the pattern of

---

**2.** In its memorandum in support of its summary judgment motion, defendant states that plaintiff is also requesting that he be allowed to use LWOP, without any adverse consequences, when he has depleted both his sick and vacation leave. Plaintiff states, however, in his memorandum in response to the summary judgment motion: "If plaintiff exhausted his vacation time and sick leave, he would be subject to the same discipline as any other employee. Plaintiff is not asking for

the ability to take any more time from work than he would otherwise be allowed." Plaintiff's Suggestions in Opposition (Doc. 45) at 17.

Defendant has offered no evidence to show that plaintiff had exhausted his accrued vacation time at any point prior to being terminated, or to show that plaintiff would have been required to use any leave without pay had his accrued vacation time been made available.

absences and the characteristics of the jobs in question. For example, in *Carr* the plaintiff's absences stretched for months at a time. 23 F.3d at 527. In one year alone, her LWOP and Absent Without Leave (AWOL) time totalled 651 hours. *Id.* In *Walders* the plaintiff was absent over four weeks per year on average, not counting vacation and sick leave which she earned at a rate of 33 days per year. 765 F.Supp. at 305–06. In *Santiago* the plaintiff had 29 unexcused absences during his last year of employment. 739 F.Supp. at 977.

In addition, defendant has not established that the nature of plaintiff's job is such that regular and predictable attendance is any more critical than it would be for any job. The *Walders* Court held that the case law did "not establish any specific attendance requirements for government or non-government jobs. Instead, the necessary level of attendance and regularity is a question of degree depending on the circumstances of each position." 765 F.Supp. at 310. The court went on to find that plaintiff's job as "part of a five-person team in an office operating under stringent statutory deadlines and subject to a significant backlog of work" clearly required regular and predictable attendance. *Id.*

Regular attendance is no doubt an essential part of almost every job, but the question is one of degree. In this case, the issue is not the total number of hours that plaintiff was absent from work. There is no evidence that the total leave hours used by plaintiff, including LWOP hours, exceeded the number of hours that he earned in vacation and sick leave. Rather, the issue is the manner in which those hours were used and the failure to schedule in advance as required by defendant's policy. After reviewing the evidence, the court finds that defendant has not established that permitting plaintiff to use unscheduled vacation to cover absences due to illness would either be an unreasonable accommodation or one that caused undue hardship.

Defendant's managers have testified that plaintiff's unscheduled absences have caused problems in scheduling the work to be completed. As Mr. Henry testified: "if I need him for an operator for a crew, five or six people, he's the one operator out on that job, I don't have that operator." Robert Henry dep. at 18–19. At the same time, defendant has not been able to produce any evidence to show that plaintiff's absences resulted in essential work not being completed in a timely manner.[3] Likewise, there is no doubt but that unscheduled absences are disruptive for managers and even other employees. Defendant has not established, however, that plaintiff's unscheduled absences were *unduly* disruptive. *See* Appendix to 29 C.F.R. § 1630.-2(p) (" 'Undue hardship' refers to any accommodation that would be unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business.").

Finally, defendant argues that it fulfilled its obligations by making offers of reasonable accommodations which plaintiff rejected. On separate occasions defendant offered plaintiff the option of either a part-time work schedule or a flexible full-time work schedule under which plaintiff and his supervisor would schedule plaintiff's work week in advance of that week. Under either alternative, plaintiff would be expected to adhere to the estab-

**3.** The following is an excerpt from Mr. Pilley's deposition:

Q. Are you aware, Mr. Pilley, of any work that was not completed in a satisfactory amount of time by your department because Mr. Dutton had taken a leave without pay?

A. I am not aware of any such thing. My department doesn't hinge on the work of one person. But it does mean that somebody has to pick up the gap.

.    .    .    .    .

Q. And somebody always was able to fill in, correct?

A. Somebody else had to do it. Now, to me it meant that some other job didn't get done that wasn't as high on the priority list, and I don't have that list at my fingertips, either. All I know is that the people out there were charged with getting work done, and they filled in and they jumped in and they did get the work done. Now, I don't know if that would be any great claim to fame to say that I wasn't there, therefore, you didn't get that culvert built or you didn't get that done or so forth. I don't think so.

Q. That wasn't a problem for your department, was it?

A. I don't believe so. If it was a real difficulty, I was never apprised of that.

James F. Pilley dep. at 81–82.

lished schedule. While this qualifies as an accommodation, the court is not convinced that it would be an effective one. The evidence shows that plaintiff's headaches are unpredictable, and therefore plaintiff would likely have the same attendance problem under either of the scheduling alternatives. *See Wimbley v. Bolger*, 642 F.Supp. 481, 486 (W.D.Tenn.1986) (A part-time position for an employee unable to give advance notice of absences would not be a reasonable accommodation because "even a part-time employee would still have a fixed schedule."). The evidence does not support defendant's rationale that these alternative work schedules would be effective because plaintiff is more likely to be absent on certain days than on others.

For the reasons stated above, the court finds that there are genuine issues of material fact which preclude a finding at this time as to the reasonableness of plaintiff's proposed accommodation or the hardship that it would cause.

IT IS, THEREFORE, BY THE COURT ORDERED that defendant's motion for summary judgment (Doc. 41) is denied.

Copies of this order shall be mailed to counsel of record for the parties.

IT IS SO ORDERED.