**Katherine R. CEHRS, Plaintiff,**

v.

**NORTHEAST OHIO ALZHEIMER RE-SEARCH CENTER and Windsor House, Inc., Defendants.**

**No. 4:95 CV 403.**

United States District Court, N.D. Ohio, Eastern Division.

March 7, 1997.

---

Stuart E. Scott, Spangenberg, Shibley, Lancione & Liber, Michael Taylor Pearson, Duvin, Cahn & Hutton, Ellen Sacks Simon, Christopher P. Thorman, Lancione & Simon, Cleveland, OH, for plaintiff.

Sally Griffith Cimini, Robert J. Henderson, Polito & Smock, Pittsburgh, PA, John P. Daliman, Windsor House, Inc., Girard, OH, for defendant.

*MEMORANDUM & ORDER*

O'MALLEY, District Judge.

Plaintiff Katherine Cehrs brings this action against defendants Northeast Ohio Alzheimer Research Center and Windsor House, Inc. (collectively, "Windsor"). Windsor is Cehrs's former employer. Cehrs claims that when Windsor terminated her, it violated (1) the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.;* (2) the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.;* (3) Ohio's anti-discrimination statute, Ohio Rev. Code § 4112.02(A); and (4) Ohio common law prohibiting tortious breach of public policy.

Windsor moves for summary judgment on Cehrs's claims (docket no. 14). For the reasons set forth below, the motion is **GRANTED.**

**I. Background**

The following facts are not in dispute. Windsor began employing Cehrs as a Licensed Practical Nurse ("LPN") beginning in June of 1991. At the inception of Cehrs's employment, Windsor knew Cehrs suffered from psoriasis. Windsor apparently accommodated various requests from Cehrs to alter her work schedule to permit her to visit her physician as needed for this condition. In the fall of 1993, Cehrs suffered a severe flare-up of her psoriasis and related psoriatic arthritis. By November 22, 1993, Cehrs's condition had deteriorated to the point she was unable to report for work. On November 26, 1993, Cehrs's doctor, Dr. Bergfeld, wrote a note to Windsor stating Cehrs needed a medical leave of absence until her condition subsided. In response to this note, Windsor sent Cehrs a medical leave of absence form. Dr. Bergfeld completed this form, filling in the "return to work date" with the word "undetermined." Windsor returned the form to Cehrs, indicating it needed a precise "return to work date," and Dr. Bergfeld wrote "1/20/94."

The condition from which Cehrs suffers is chronic, but is marked by long periods of dormancy interrupted with highly symptomatic "flare-up" phases. Prior to 1993, Cehrs had not suffered a flare-up or been hospitalized for many years. During the November 1993 flare-up, Cehrs's condition was akin to having a painful burn over her entire body. Her skin was raw, ulcerated, and bloody; her joints were swollen and stiff. During this time, Cehrs was effectively 100% disabled, as she could not walk, sit comfortably, drive, or even dial a telephone without serious pain.

When Cehrs visited Dr. Bergfeld on January 10, 1994, Dr. Bergfeld determined that Cehrs's condition remained serious, and wrote a note that her medical leave of absence should be extended for "at least one additional month." Cehrs's daughter hand-

delivered Dr. Bergfeld's note to Windsor on January 11, 1994, but it appears that she did not deliver the note to Cehrs's supervisors and the parties dispute whether Cehrs's supervisors ever became aware that the note had been delivered. Cehrs met with Dr. Bergfeld again on February 14, 1994, at which time Dr. Bergfeld determined Cehrs was doing much better. This time, Dr. Bergfeld wrote a note stating that Cehrs could return to work part-time on March 1, 1994, and full-time on April 1, 1994. Cehrs's daughter delivered this second note to Windsor on February 14, 1994. Despite delivery of these notes, however, it is undisputed that Cehrs never requested or filled out a Windsor-supplied form to extend her medical leave of absence.

Cehrs attempted to return to work on a part-time basis on March 2, 1994.[1] At that time, Cehrs was informed by her supervisor, Barbara Sladewski, that she had been terminated effective January 20, 1994, her original return to work date, because she had failed to fill out the paperwork necessary to extend her leave of absence. While Cehrs claims she spoke to Sladewski in late February and was led to believe that she would be placed on the schedule after March 2, 1994, Sladewski denies that she ever spoke to Cehrs before March 2, 1994 about her employment.

On March 3, 1994 Cehrs applied for rehire. On March 9, 1994, Cehrs's new doctor, Dr. Mehle, examined Cehrs, On that date, Dr. Mehle wrote a note stating Cehrs could "return to work full-time effective immediately" Cehrs delivered this note to Windsor without delay, but Windsor never offered Cehrs reemployment. Between March and November of 1994, Windsor hired three LPNs. Also, during the time Cehrs was on medical leave, Windsor had hired one full-time Registered Nurse ("RN").

Windsor's medical leave policy allows an employee an initial period of up to ninety days unpaid leave, plus an additional ninety day (still unpaid) extension. Windsor asserts its "official" policy is that employees may *not take or extend* medical leaves without filing a medical leave request form. As a matter of practice, there is evidence that Windsor has allowed employees to submit medical leave request forms on dates after the employees began their leave periods, and even after employees returned to work from medical leave.[2] Indeed, Cehrs submitted (and Windsor accepted) her initial medical leave form *after* November 22, 1993, the day she began her medical leave.

## II. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure dictates that, where summary judgment is sought:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

While all evidence must be viewed in the light most favorable to the non-moving party, summary judgment is appropriate whenever that non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "In other words, the movant [can] challenge the opposing party to 'put up or shut up' on a critical issue. After being afforded sufficient time for discovery, as required by Fed.R.Civ.P. 56(f), if the respondent [does] not 'put up,' summary judg-

---

**1.** There is no evidence that Windsor employed medical professionals on a part-time, rather than a full-time, basis as of March 2, 1994, or that such an arrangement would be feasible.

**2.** Of course, this practice makes sense in the context of *initial* medical leave, the need for which often cannot be predicted. The need for an *extension* of a previously obtained medical leave, however, is more predictable; thus, re-

quiring an employee to submit a medical leave form requesting extension of medical leave before the extension begins is more reasonable. There is no evidence that Windsor accepted medical leave extension forms from employees after their initial leave period had expired and there is no evidence that Windsor ever excused an employee altogether from submitting a medical leave form.

ment [is] proper." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

In this context, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479–80 (citing *Frito–Lay Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988)). The trial court need not seek out factual disputes nor speculate on the possibility that, under some as yet unstated scenario, a meaningful factual dispute might somehow arise. The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established, which create a genuine issue of material fact. *See Fulson v. City of Columbus*, 801 F.Supp. 1, 4 (S.D.Ohio 1992).

### III. ADA Claim

The method and manner of proof of a claim under the ADA is "roughly equivalent" to the standards used under other employment discrimination statutes. *Monette v. Electronic Data Systems, Corp.*, 90 F.3d 1173, 1178–79 (6th Cir.1996); *see Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157 (3d Cir.1995) (prima facie case and burden shifting analyses used in Title VII and Age Discrimination in Employment Act cases apply identically to ADA case); 42 U.S.C. § 12117(a) ("[t]he powers, remedies, and procedures set forth in [Title VII] shall be the powers, remedies, and procedures [which the ADA] provides ... to any person alleging discrimination on the basis of disability").

These methods and manners of proof are outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973) and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981). To avoid summary judgment, a plaintiff must first make out a prima facie case of discrimination based on disability by demonstrating that: (1) she is disabled within the meaning of the ADA; (2) she is qualified for the job, meaning that with

or without reasonable accommodation (which she must describe), she is able to perform the essential functions of the job; (3) she was subjected to an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) she was replaced by a non-disabled person or treated less favorably than non-disabled employees. *Monette*, 90 F.3d at 1185. The plaintiff must establish each of these elements to make out a prima facie case under the ADA.

If the plaintiff successfully proves a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 1179. The employer's articulation of a nondiscriminatory reason is legitimate if it is "clear, reasonably specific and worthy of credence." *Jordan v. Wilson*, 755 F.Supp. 993, 996 (M.D.Ala.1990). Once the employer carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Monette*, 90 F.3d at 1179. The Supreme Court has stated that, in order to show pretext, the plaintiff must demonstrate *both* that the proffered "reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). *Hicks* made clear that when an employer proffers a nondiscriminatory explanation for its action, the inference of discrimination based upon the plaintiff's prima facie case changes from a mandatory one (which the fact finder must draw) to a permissive one (which the fact finder may draw), provided that the fact finder concludes the employer's explanation is "unworthy" of belief The fact finder, however, must have a sufficient basis in the evidence for rejecting the employer's explanation. *See id.* at 519, 113 S.Ct. at 2753–54.[3]

---

3. The Sixth Circuit has set forth three ways that a plaintiff may produce sufficient evidence from which the fact finder may reasonably reject the employer's explanation. *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 883 (6th Cir. 1996); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). First,

the plaintiff can show that the proffered reason is factually false. Second, the plaintiff can show that the proffered reason was not sufficient to justify the adverse action taken against the plaintiff This can be done by showing that other employees, who engaged in substantially identical conduct, were not the recipients of similar

Windsor argues that Cehrs is unable to make a sufficient showing on any of the elements of the prima facie case. As noted, if Windsor is correct as to even one element, Cehrs is unable to make out a prima facie case and Windsor must be granted summary judgment on this claim. The Court concludes that Cehrs has not made a sufficient showing on the second prong of her prima facie case and that judgment in defendants' favor is appropriate.

### Cehrs Failed To Show That She Is a Qualified Disabled Person Within the Meaning of the ADA

■ Title I of the ADA states that "[n]o covered entity shall discriminate against a *qualified individual with a disability* because of the disability of such individual in regard to ... terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added). A "qualified individual with a disability" is defined as

> an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

42 U.S.C. § 12111(8). These provisions essentially mandate that the ADA provides relief only to individuals who are *both*: (1) disabled *and* (2) can perform the essential functions of the job they hold or seek, with or without any reasonable accommodation. The ADA defines a disability to include "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). "Major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The term "reasonable accommodation" may include "job restructur-

ing, part-time or modified work schedules, reassignment to a vacant position...." 42 U.S.C. § 12111(9)(B).

In this case, the evidence is undisputed that the disabling aspect of Cehrs's condition was both intermittent and totally debilitating. In other words, Cehrs was completely capable of performing her position without accommodation *except during "flare-ups"* which occurred unexpectedly but apparently no more often than every few years.[4] During those "flare-ups," and especially during the episode that began in November of 1993, Cehrs was incapable of functioning in her position and, indeed, was incapable of most normal day-to-day functioning. This state persisted so that, when her medial leave expired on January 20, 1994, Cehrs remained incapable of performing her job and remained incapable of doing so for at least several more weeks. Indeed, Cehrs provided medical documentation establishing that she was incapable of performing any of the functions of her job until at least March 1, 1994 and could not resume full-time work until at least April 1, 1994. Thus, by her own admission, had she not been terminated, Cehrs could not have worked at all for four to five consecutive months.

■ As indicated above, under Title I of the ADA, as one of the elements of the prima facie case, the plaintiff must show that she is "otherwise qualified" for the job, with or without "reasonable accommodation." *Monette*, 90 F.3d at 1185, 1187. Although the employer bears the burden of persuasion on whether a proposed accommodation would impose an "undue hardship," "the disabled individual bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Id.* at 1183. Cehrs claims that, while she is admittedly incapable of functioning in her job during her "flare-ups," her employer should

adverse action. Third, the plaintiff, while not disputing the truth of the proffered reason, can present evidence to show that the proffered reason did not actually motivate the adverse action taken. Under this third scenario, the plaintiff must present some proof, beyond the prima facie case, of retaliation. *Manzer*, 29 F.3d at 1084. Each of these methods presents a sufficient evidentiary basis to create a "suspicion of mendacity" from which the fact finder may infer illegal

retaliation and reject the employer's proffered explanation. *Id.* (citation omitted).

4. The parties agree that, over a 30–year period, Cehrs was hospitalized 10 times and that, during her tenure at Windsor, she suffered only one "flare-up," the one that is the subject of these proceedings.

"accommodate" her periods of incapacitation by giving her leaves of absence that correspond to them, especially where, as she claims, the employer has given extended leaves of absence to other employees in the past.[5]

Assuming for purposes of this opinion that plaintiff's psoriasis is a disability,[6] Cehrs fails to state a prima facie case because she did not establish that she can perform, even with her proposed accommodation, the essential functions of her job. Cehrs proposes no plan showing how the staff at Windsor could assure that, during plaintiff's proposed lengthy absence, her essential job functions would be performed. Although no one disputes that, during the dormant phase of her psoriasis, plaintiff can adequately perform the essential functions of her job with no accommodation, during flare-up periods, plaintiff concedes she is incapable of working at all for an indeterminate period of time. Further, plaintiff concedes that she cannot predict when these indeterminate down-times will occur.

Generally, "employees cannot perform their jobs successfully without meeting some threshhold [sic] of both attendance and regularity." *Walders v. Garrett*, 765 F.Supp. 303, 309 (E.D.Va.1991) (holding that plaintiffs absences, which averaged over four weeks per year, not counting vacation and sick leave, precluded her from performing her essential job functions), *aff'd*, 956 F.2d 1163 (4th Cir. 1992); *see Carr v. Reno*, 23 F.3d 525, 527, 530–31 (D.C.Cir.1994) · (holding, under the Rehabilitation Act of 1973, that plaintiffs "prolonged, frequent, and unpredictable absences", for months at a time, rendered her unqualified because "an essential function of any . government job is an ability to appear for work (whether in the workplace or, in the unusual case, at home)"); *Tyndall v. National Educ. Ctrs. Inc.*, 31 F.3d 209, 213 (4th Cir.1994) ("[A] regular and reliable level of attendance is a necessary element of most jobs."); *Santiago v. Temple University*, 739 . F.Supp. 974, 979 (E.D.Pa.1990) ("An employee of any status, full or part time, cannot be qualified for his position if he is unable to attend the workplace to perform the required duties, because attendance is necessarily the fundamental prerequisite to job qualification."), *aff'd*, 928 F.2d 396 (3d Cir.1991); *Lemere v. Burnley*, 683 F.Supp. 275, 280 (D.D.C.1988) (holding that federal employee with pattern of unscheduled absences caused by alcoholism was not a "qualified handicapped individual" under the Rehabilitation Act); *Matzo v. Postmaster General*, 685 F.Supp. 260, 263 (D.D.C.1987) (granting summary judgment against manic-depressive postal worker who missed several months of work based on holding that ability to report for work and stay on duty is a basic ·job qualification), *aff'd*, 861 F.2d 1290 (D.C.Cir. 1988); *Wimbley v. Bolger*, 642 F.Supp. 481, 485 (W.D.Tenn.1986) ("It is elemental that one who does not come to work cannot perform any of his job functions, essential or otherwise."), *aff'd*, 831 F.2d 298 (6th Cir. 1987).

The Court recognizes there may be some instances where tolerating a certain amount of leave time because of a disability *may* constitute a reasonable accommodation that

---

5. Cehrs has offered no evidence indicating that similarly situated employees were treated differently—*i.e.*, were allowed to extend leaves of absence beyond 90 days without supplying the proper paperwork for doing so. In fact, Cehrs does not describe in any detail the circumstances of other employees who she claims were granted longer leaves of absence.

6. Defendants argue that, if this Court finds Cehrs is disabled at all, the disability should be limited to that period of time when Cehrs suffers a flare-up of her psoriasis. (Defendant's brief, at 9.) This argument is premised on the theory that only during flare-ups does the plaintiff's impairment substantially limit major life activities. We need not decide this issue because we assume for purposes of this opinion that Cehrs's psoriasis is

a physical impairment and that flare-ups are merely one aspect of that underlying impairment. *See Roush v. Weastec, Inc.*, 96 F.3d 840, 844 (6th Cir.1996) (holding that intermittent bladder infections were manifestation of disability and therefore part of the underlying impairment of bladder condition); *Vande Zande v. Wisconsin Department of Administration*, 44 F.3d 538, 544 (7th Cir.1995) ("Intermittent, episodic impairments are' not disabilities, the standard example being a broken leg. ... But an intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate.").

448

does not impose an undue hardship on the employer and, thus, would not meaningfully affect an employee's qualification for the job. For example, plaintiff cites *Dutton v. Johnson County Board of County Commissioners,* 859 F.Supp. 498 (D.Kan.1994), where the plaintiff was terminated due to absenteeism resulting from his migraine headaches, not from any deficiency in the quality of his work. *Id.* at 501. In *Dutton,* the plaintiff presented evidence to show that his headaches were severe and debilitating when they occurred. Although they did not last a long period of time, the headaches were deemed a permanent, or long-term condition in that the plaintiff had experienced them intermittently for over twenty years. The plaintiff "requested that defendant accommodate his disability by allowing him to use vacation time for unscheduled absences due to illness when he has exhausted his available sick leave." *Id.* at 507. The *Dutton* Court held that the defendant had "not established that permitting the plaintiff to use unscheduled vacation to cover absences due to illness would either be an unreasonable accommodation or one that caused undue hardship." *Id.* at 508; *see Carlson v. InaCom Corp.,* 885 F.Supp. 1314, 1321 (D.Neb.1995) (court "declined" to make a judicial determination that attendance is an essential element of employment at Inacom, where the company had no written policy regarding unscheduled absences, the employee's unscheduled absences due to migraine headaches averaged seven days per year, and no evidence was presented to establish that plaintiff's absences resulted in essential business not being completed in a timely and efficient manner).

The *Dutton* Court reasoned that "[r]egular attendance is no doubt an essential part of almost every job, but the question is one of degree." *Id.* The Court distinguished *Carr, Walders,* and *Santiago* based on the pattern of absences in those cases, *i.e.,* lengthy, unpredictable leaves of absence. *See Carr,* 23 F.3d at 527 (plaintiff's absences stretched for months at a time); *Walders,* 765 F.Supp. at 306 (during four-year period, plaintiff with Chronic Fatigue Syndrome was absent from

work approximately sixty to ninety days per year); *Santiago,* 739 F.Supp. at 977 (plaintiff had twenty-nine unexcused absences in his last year of employment). This case is distinguishable for the same reason. In contrast to the sporadic migraine headaches in *Dutton,* which caused the plaintiff to be absent a total of twenty-nine work days between 1989 and August 1992, *Dutton,* 859 F.Supp. at 502, Cehrs could not work at all, even on a part-time basis, for approximately four to five months in a row. Although "the necessary level of attendance and regularity is a question of degree depending on the circumstances of each position," *Walders,* 765 F.Supp. at 310 (citing 29 C.F.R. § 1613.702(f)), Cehrs has not met her initial burden of proving that her proposed accommodation is objectively reasonable because she has not suggested how Windsor should accomplish her essential job functions during her lengthy absence. *See Monette,* 90 F.3d at 1187 (holding that plaintiff who proposed as an accommodation "a requirement that the defendant should have kept him on unpaid medical leave indefinitely until another ... position opened up" failed to establish that his proposed accommodation was a "reasonable" one under the ADA). On the face of the record in this case, Cehrs has failed to establish an essential element of her prima facie case—that she was a "qualified individual with a disability" within the meaning of the ADA.

Congress made clear in the ADA that the Act was intended to protect individuals against discrimination in those circumstances where the individual is both disabled *and* qualified *at the same time.*[7] Cehrs failed to show that she was qualified to perform the essential functions of the job and therefore fails to make out a prima facie case of discrimination under the ADA. Accordingly, the Court **GRANTS** defendants' motion for summary judgment on Cehrs's ADA claim.

## IV. Family and Medical Leave Act Claim

■ Cehrs asserts that she was terminated in violation of The Family and Medical

7. This makes sense when one considers that Congress sought, through the ADA, to balance the legitimate interests of disabled individuals

against those of the employer in maintaining reasonable efficiency and continuity in its work force.

Leave Act ("FMLA"), 29 U.S.C. § 2612(a).[8] The FMLA, which went into effect in 1993, entitles covered employees the right to take up to a total of twelve weeks of unpaid leave per year under certain specified circumstances. Specifically, the FMLA provides in pertinent part:

(a) In General

(1) Entitlement to Leave

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

\* \* \* \* \* \*

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612. Thus, an eligible employee is entitled to a total of twelve workweeks of leave during any twelve-month period if a serious health condition renders the employee unable to perform the functions of the employee's position.

■ In this case, it is undisputed that on November 22, 1993, Cehrs's condition had degenerated such that she was no longer capable of working. Consequently, the twelve weeks of unpaid leave to which Cehrs could invoke a right under the FMLA began on November 22, 1993 and would have ended on February 12, 1994.[9]

Windsor did not make the decision to terminate Cehrs until March 2, 1994, well after February 12, 1994. It is undisputed that Cehrs had not returned to work as of March 2, 1994 and was not authorized by her physician to return to work full-time until April 1, 1994. Thus, at all times prior to the expiration of the twelve-week period protected by the FMLA, Cehrs was unable to perform the functions of her position, and she remained unable to do so for some substantial period thereafter.

Cehrs claims that, despite these undisputed facts, Windsor is chargeable with a violation of the FMLA because Windsor backdated the effective date of her discharge to January 20, 1994. Windsor chose January 20, 1994 as the effective termination date because of its own policy with respect to leave requests. As indicated above, Cehrs never completed Windsor's leave request form. While Cehrs is correct that Windsor's leave policy cannot override the FMLA, under the circumstances at issue here, the termination date chosen is insufficient to justify the conclusion that Windsor violated the FMLA when it terminated Cehrs. As noted, Cehrs was not actually terminated until March 2, 1994, more than two weeks after the expiration of the twelve-week period protected by the FMLA. It is undisputed, moreover, that Cehrs was unable to return to work on February 12, 1994 and remained

---

8. The Court's consideration of plaintiff's ADA and FMLA claim are unrelated. The FMLA explicitly provides that "[n]othing in this Act or any amendment made by this Act shall be construed to modify or affect any Federal or State law prohibiting discrimination on the basis of ... disability." 29 U.S.C. § 2651(a); *see* S. Rep. No. 103-3, at 38 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 40 (The FMLA is "not intended to modify or to affect ... the Americans with Disabilities Act of 1990, or the regulations issued under that act. Thus, the leave provisions of the Family and Medical Leave Act are wholly distinct from the reasonable accommodation obligations of employers covered under the Americans with Disabilities Act.... The purpose of the FMLA is to make leave available to eligible employees and employers within its coverage, and not to limit already existing rights and protection.").

9. There is some question as to whether Cehrs properly invoked a right to a full 12 weeks of leave under the FMLA. An employee has an obli-

gation to make the employer aware of the need for FMLA-qualifying leave in order to invoke the protections of the Act. While notice to the employer may be informal and need not invoke the FMLA by name, the employer, at a minimum, must receive information sufficient to make it evident that the leave requested is qualifying leave under the FMLA. *See, e.g., Reich v. Midwest Plastic Engineering, Inc.,* No. 1:94–CV–525, 1995 WL 514851 (W.D.Mich. July 26, 1995). Here, Cehrs certainly provided adequate notice of the need for the FMLA-qualifying leave up to January 20, 1994, the date her physician initially specified as her return to work date. The January 11, 1994 note may or may not have been sufficient to invoke the right to FMLA leave for the additional three weeks authorized by the Act. Because a resolution of this question is not necessary to the decision the Court reaches here, the Court assumes for purposes of its decision today that Cehrs invoked the right to leave until February 12, 1994.

unable to do so for some period of time thereafter. Since Cehrs could have been terminated as of March 2, 1994, or as of February 13, 1994, without running afoul of the FMLA, where, as here, Cehrs was on an *unpaid* leave of absence, it would be elevating form over substance to say that the effective termination date chosen by Windsor is meaningful to the Court's analysis under the FMLA.[10] Accordingly, defendants's motion for summary judgment on plaintiff's FMLA claim is **GRANTED**.

### V. Pendent State Law Claims

Cehrs also brings claims under state law for violation of Ohio Revised Code § 4112.02(A) and Ohio common law prohibiting tortious breach of public policy. Subject matter jurisdiction in this case was based on the existence of federal questions under the ADA and FMLA. This Court has jurisdiction over Cehrs's state law claims only if they are so related to her federal law claims that they are part of the same case or controversy. 28 U.S.C. § 1367(a) (defining the court's "supplemental" jurisdiction). Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise supplemental jurisdiction if the federal claims over which it had original jurisdiction have all been dismissed. "[I]f the federal claims are dismissed before trial, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Williams v. City of River Rouge*, 909 F.2d 151, 157 (6th Cir.1990). Accordingly, this Court exercises its discretion and DISMISSES Cehrs's supplemental state law claims, without prejudice, for lack of a substantial federal claim.

**IT IS SO ORDERED.**

---

10. The Court notes that plaintiff has not presented any evidence or argument suggesting that she lost any substantive benefits as a result of defendants' decision to back-date her termination date.