Debra CARLSON, Plaintiff,

v.

INACOM CORP., Defendant.

No. 4:CV94–3008.

United States District Court,
D. Nebraska.

Feb. 21, 1995.

David W. Rowe, Kinsey, Ridenour Law Firm, Lincoln, NE, for plaintiff.

Patrick J. Barrett, McGrath, North Law Firm, Omaha, NE, for defendant.

## MEMORANDUM OF DECISION

URBOM, Senior District Judge.

The plaintiff, Debra Carlson, has filed a disability discrimination action under The Americans with Disabilities Act, ("ADA") 42 U.S.C. § 12101 et seq.[1] She has alleged that her former employer, InaCom Corporation, violated the ADA by terminating her and failing to offer a reasonable accommodation for her disability. A three-day nonjury trial was conducted on January 30 through February 1, 1995. After review of the testimony and evidence submitted, the following represent my findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Debra Carlson is a United States citizen and a resident of the City of Lincoln, Lancaster County, Nebraska. InaCom Corporation ("InaCom") is a Delaware corporation qualified to do business in the State of Nebraska. InaCom sells computers and computer-related products and services. InaCom is an employer within the meaning of the ADA, as defined by 42 U.S.C. § 12111(5)(a).

On December 7, 1987, the plaintiff completed an employment application with the defendant and answered the question "[d]o you have any physical or health limitations which affect your job performance?" in the negative[2]. On December 29, 1987, Carlson

---

1. The plaintiff filed a charge of discrimination against InaCom with the Equal Employment Opportunity Commission ("EEOC") within the required 180 days and received a notification of Right to Sue from the EEOC on November 15, 1993. Filing 38 at ¶¶ 1 & 2, and attachment to filing 1. This court has subject matter jurisdiction pursuant to 42 U.S.C. § 12117, 42 U.S.C. § 2000e–5, and 28 U.S.C. § 1331.

2. The plaintiff testified at trial that she has never disclosed on an employment application that she suffers from migraine headaches. Defense Exhibit 114 is identified as the plaintiff's employment application with Lincoln Aviation complet-

commenced her employment with InaCom as a secretary in what was known as the Franchising Department, now known as the Corporate Development Department ("Corporate Development"). In her initial position as secretary, Carlson received an hourly wage of $7.69 plus $25.00 in commission income for each franchise and value-added reseller recruited by the department. On March 26, 1990, Carlson was promoted to executive secretary, a position she held until her termination on November 9, 1992. As an executive secretary Carlson was paid an hourly rate of $8.58 plus a commission income of $50.00 for each new client recruited.

The plaintiff's duties included performing such clerical tasks as answering the phone, typing, handling mail, making travel arrangements, processing paperwork, product applications, financial reports, updating addresses and authorization numbers, and monitoring the timely completion of franchise tax returns. Carlson testified that she reported to Michael Steffan, then Vice President for Corporate Development, and she estimated that approximately fifty percent of her workload comprised of providing secretarial support to Steffan and fifty percent to the other employees in Corporate Development.

Between December 1987 and April 1992 Carlson was the only staff support person working in Corporate Development, a department which increased in size from approximately five employees in 1987 to twelve employees in 1992. Between 1989 and early 1992, Ms. Carlson was given the additional responsibility of being the phone administrator of the Audix phone system for the entire InaCom corporate office. Her duties as phone administrator included programming phones for employees for voice mail usage.

During her employment with InaCom, the plaintiff performed her secretarial duties efficiently and satisfactorily. At an awards banquet held in December 1988, the president of Valmont Industries presented the Corporate Development employees, including Carlson, with individual plaques commemorating the department's outstanding business development. Plt. Ex. 30. Penny Klug, who worked for Corporate Development and later became the Director of Human Resources, testified that when Carlson was at work, she worked hard and produced satisfactorily. Teresa Vance, who was formerly employed in the Franchising/Corporate Development Department at InaCom, testified that, at least initially, Carlson impressed her as being intelligent and a good worker. Steffan, Carlson's supervisor, testified that Carlson completed his work quickly.

Since 1980, Carlson has suffered from migraine headaches. She has reported her migraine headaches to attending physicians on several occasions.[3] According to Carlson's testimony, she suffers from at least one severe migraine headache every month or two. When she feels an oncoming migraine headache, she takes 800 milligrams of Motrin. Physicians have prescribed other medications[4], but Carlson testified that Motrin

ed on December 5, 1992, and Defense Exhibit 115 is identified as the plaintiff's employment application with the Lincoln Chamber of Commerce completed on 6/29/94. Neither application notifies the employer that the plaintiff suffers from migraine headaches; however, the applications contain no question pertaining to physical or mental disability.

3. In January 1980, the plaintiff saw Dr. Slabaugh at the Physicians' Clinic in Omaha, Nebraska for treatment of her migraine headaches. Plt. Ex. 1 at 005. On September 22, 1988, Carlson saw Dr. Michael Domalakes for a severe migraine headache. *Id.* at 027. On April 4, 1990, Carlson saw Dr. Domalakes who recorded that Carlson "complain[ed] of a past history of migraine headache which have been treated well p.r.n. Fiorinal # 3." *Id.* at 034. In September 1990, the plaintiff sought emergency medical attention at Meth-

odist Hospital in Omaha. Plt.Ex. 3. Additionally, medical records from Bryan Memorial Hospital in Lincoln, Nebraska and medical records from Dr. Samuel Smith's office in Lincoln make reference to Carlson's migraine headaches. Plt. Ex. 4 & 5.

4. In 1980, Dr. Slabaugh prescribed Cafergot and refilled the prescription twice. In September 1988, Dr. Domalakes gave Carlson an injection of Demerol and Vistaril. He also prescribed Fiorinal # 3 to Carlson on an as needed basis for severe migraine headaches. In September 1990, Carlson was treated at the emergency room at Methodist Hospital in Omaha for a severe migraine headache and was given an injection of Nubain and Phenergan. Two years later, in September 1992, Carlson received pain medication for a migraine headache during a hospital stay at Bryan Memorial Hospital.

seems to be the most effective medication. The Motrin does not prevent the migraine headaches and rarely relieves all the pain, but it does provide some pain relief.

Carlson testified that her migraine headaches remain, on average, from one to two days, and, on occasion, three to four days. Her migraine symptoms include blurred vision, nausea, vomiting, and severe head pain. During periods when Carlson experiences severe migraine headaches, light and noise are painful to her, and she must retreat to a dark silent room. Gary Carlson, the plaintiff's husband, testified that, when his wife suffers from migraines, she cannot concentrate on household tasks, interact with others, care for her minor son, drive a motor vehicle, or work.

Carlson experienced migraine headaches during her employment with InaCom. The plaintiff estimated that she missed work unexpectedly due to illness on the average of nine times per year, with an average seven absences attributed to migraine headaches. Between December 1987 and September 1992, Carlson missed 44 days of work due to unexpected illness and missed four additional scheduled days for foot surgery.[5]

As of December 1988, the plaintiff's first anniversary date, InaCom's employee benefits policy entitled her to 10 days annual vacation, one free day, and an unspecified number of sick days per year. No absentee policy existed at InaCom. Each time Carlson was ill, either she or her husband phoned Corporate Development and notified either Mike Steffan or Chris Friewald, who served as Carlson's supervisor in Steffan's absence. Steffan testified that on occasions Carlson left voice messages informing him that she was ill and would not be in that day. Steffan testified that he did not recall Carlson giving reasons for her absences. Upon her return to work Carlson would complete a time-off form and submit it to Steffan, Friewald, or another supervisor for signature.[6]

Beginning in 1991, several Corporate Development employees voiced complaints to Steffan about Carlson's absences causing a negative impact on the department. Teresa Vance testified that, for over a year, she "nagged" Steffan about Carlson's absences, telling him that Carlson was taking advantage of the company, and urging Steffan to do something about Carlson's unscheduled absences. In addition to Vance, Steffan testified that he received complaints about Carlson's absences from Chris Friewald, Marcia Karakas, Christie Pavel, and Penny Klug. Although Steffan made no written record of specific complaints lodged against Carlson, he testified that he told Carlson that her fellow employees had voiced complaints to him about her absenteeism.

In April 1992 Steffan told Bill Fairfield, President and Chief Executive Officer of InaCom, that he was dissatisfied with Carlson and needed to hire a more reliable employee, who could be trained to replace Carlson. Steffan reached an agreement with Fairfield that after a replacement was hired and trained, Carlson would be transferred to another part of the company. On April 27, 1992, Steffan hired Rita Rocker as a staff support person to assist with paperwork and other secretarial duties. When Carlson asked Steffan why Rocker had been hired, Steffan told Carlson that he had become dissatisfied with her performance and advised her to work on improving her attendance.

---

5. In 1988, Carlson was absent from work due to illness 9.5 days, 6 were due to migraines; in 1989, Carlson missed 7 days due to illness, all due to migraines; in 1990, Carlson was absent with illness from work 11 days, 7 absences due to migraines; in 1991, Carlson missed 8.5 days due to illness, with all absences due to migraines; and in 1992, Carlson was absent with illness 12 days, 8 absences due to migraines, and 4 days for Morton's Neuroma surgery. In all, Carlson missed 48 days due to illness, 44 of which were unscheduled absences with the remaining 4 absences scheduled in advance for surgery.

6. An area existed on the InaCom time-off forms to document the type of illness. During her employment with the defendant, Carlson indicated four causes for illnesses: —once for bronchitis, once for a sinus infection, once for flu, and once for Morton's Neuroma foot surgery. No time-off form completed by the plaintiff documented a migraine headache as the reason for an unscheduled absence.

On January 1, 1992, InaCom implemented a Paid Time Off ("PTO") Program for employees in which all personal leave time, scheduled and unscheduled, is subtracted from one pool of hours allotted to the employee. The number of hours allocated to each employee is dependent upon his or her length of service with InaCom. Plt Ex. 15. In January 1992 with four years of service Carlson was allotted 13.5 PTO days plus three additional PTO days, given to all InaCom employees, for a total of 16.5 PTO days.

Between January 1 and July 6, 1992, Carlson was absent 17⅜ days (139.0 hours) from work.[7] Steffan recalled that he spoke to Carlson about her unscheduled absences on three occasions: prior to her move to Lincoln in November 1990 [8], in February 1992 [9], and May 1992 [10]. However, on cross-examination Steffan also testified that he never documented his meetings with Carlson, never wrote a memorandum to the file, never refused to sign Carlson's PTO forms, never requested that Carlson provide him with a physician's note to verify an absence, and never performed a written evaluation of the plaintiff. Steffan also testified that he did not personally believe in writing up employees for disciplinary infractions.

Both on direct examination and rebuttal Carlson admitted that Steffan had spoken to her about her absenteeism. However, she testified that Steffan had casually raised the issue on only two occasions when she was passing through his office. Carlson further testified that Steffan never informed her that her employment with InaCom was in jeopardy due to her absences.

Steffan testified that shortly after Carlson's unscheduled absence from work on July 6, 1994, but prior to her ankle injury in September 1992, he was determined to get Carlson out of Corporate Development and thought termination was the best means. Steffan testified that he did not terminate Carlson immediately because he wanted Rita Rocker, a staff support person hired in April 1994, to finish training on Carlson's duties. Steffan also delayed terminating Carlson because it was necessary to reassign the Audix phone system duties to another employee.

On September 14, 1992, the plaintiff broke her ankle and was placed on short-term disability leave. When Carlson returned to work on November 9, 1992, Steffan terminated her. Penny Klug testified that she was present in the conference room when Steffan notified Carlson that she was being terminated for excessive absenteeism. Neither Steffan nor Klug discussed with Carlson the nature or causes of the her absences, the inappropriateness of any unscheduled absences, or the possibility of relocating Carlson to another department within the company. Carlson testified that she did not discuss the reasons for her unscheduled absences with Steffan and Klug, nor did she ask for an accommodation or transfer to another department. Carlson did ask Klug if she could resign, and Klug advised Carlson that she would be permitted to resign if she tendered a letter to the Human Resources Depart-

---

**7.** Carlson had unscheduled absences on January 8, 9, 10, February 17, 18, 19, 20, May 1, and July 3, 1992. She took scheduled leave time on May 12–15, 1992, for foot surgery. Carlson took scheduled vacation time on May 7, 8, 11, three hours paid leave on May 26, and another vacation day on July 6, 1992.

**8.** Steffan testified that he called Carlson into his office to discuss the problem of her absenteeism and to relay complaints by her coworkers. Steffan stated that Carlson told him that her unscheduled absences related to problems she was encountering with her boyfriend. During the discussion Carlson made no mention of headaches, requested neither a change in her duties or reassignment, and made no offer to make up hours.

**9.** Following four days of absences on February 17–20, 1992, Steffan testified that he told Carlson

that her absences were unacceptable and spoke again of coworker complaints. Steffan testified that he told Carlson that her unscheduled absences placed a substantial burden on Corporate Development. He also stated that Carlson made no mention that she suffered from migraine headaches.

**10.** Steffan testified that he spoke to Carlson a third time after her elective Morton's Neuroma surgery in May 1992 and told her that her absences could no longer be tolerated. According to Steffan, he does not recall that Carlson submitted a PTO form for foot surgery in advance of taking leave from work. Steffan also stated that Carlson made no mention of migraine headaches.

ment. Carlson never tendered a resignation letter.

On December 5, 1992, Carlson completed an employment application with Lincoln Aviation Insurance, Inc. ("Lincoln Aviation"). The employment application did not inquire whether the applicant suffered from any physical or mental disability. Def.Ex. 114. Carlson made no mention on her application of being disabled by migraine headaches. On December 28, 1992, Carlson began working for Lincoln Aviation. Beginning in June 1993, Carlson took unpaid sick leave because of pre-term labor problems related to her pregnancy. On July 2, 1993, Carlson's supervisor terminated her because her lengthy absence was too difficult on the company.

On June 29, 1994, Carlson completed an application for employment with the Lincoln Chamber of Commerce. The application did not inquire about, nor did Carlson voluntarily reveal, any information concerning a disability. On July 1, 1994, Carlson commenced employment with the Lincoln Chamber of Commerce, where she is currently employed.

## II. CONCLUSIONS OF LAW

The Americans with Disabilities Act ("ADA") prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual. . . ." 42 U.S.C. § 12112(a). The ADA prohibits an employer from discriminating against such persons with regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* The term "discriminate" is given various definitions in section 12112 of Title 42 of the United States Code. For the purposes of this lawsuit the plaintiff has alleged that InaCom discriminated against her by "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an . . . employee. . . ." 42 U.S.C. § 12112(b)(5)(A).

In order to establish a prima facie case of disability discrimination under the ADA, the plaintiff must prove that she is "disabled" and "qualified" to perform the essential functions of the job either with or without reasonable accommodation. *Dutton v. Johnson County Bd. of County Comm'rs,* 859 F.Supp. 498, 504 (D.Kan.1994) (citing *Pushkin v. Regents of the University of Colorado,* 658 F.2d 1372, 1385 (10th Cir.1981)). The burden of production then shifts to the defendant either to rebut those claims or establish that the reasonable accommodation required would create an undue hardship.

In this case Carlson contends that she is disabled but would have been qualified to perform the essential functions of the executive secretary job at InaCom with a reasonable accommodation. The defendant argues that: 1) Carlson is not disabled within the meaning of the statute; 2) she is not a "qualified individual" because her record of absenteeism precludes her from performing essential functions; and 3) the defendant did not know the plaintiff was disabled and had no duty to provide a reasonable accommodation.

### A. Plaintiff's Disability

Under the ADA a disability is defined as "(A) a physical or mental impairment that substantially limits one or more of the life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The plaintiff claims she is disabled by reason of a physical impairment—migraine headaches—which substantially limits her major life activities. The Code of Federal Regulations defines a "physical or mental impairment" as "[a]ny physiological disorder, or condition" which affects one or more of the various body systems, including the cardiovascular system. 29 C.F.R. § 1630.2(h)(1). Examples of "major life activities" include those activities which an average person can perform with little or no difficulty, such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" is defined as either the inability to perform a major life activity, or a serious restriction on the ability to perform a major life activity as compared to an average person in the general population. 29 C.F.R. § 1630.2(j)(1).

The preponderance of the evidence in this case easily establishes that the plaintiff's migraine headaches constitute a physiological disorder which affects both the Carlson's neurological and vascular systems. *Dutton, supra,* 859 F.Supp. at 506. When Carlson gets a migraine, the headache is severe and debilitating. Both the plaintiff and her husband testified that when Carlson has a migraine headache, she is substantially limited in major life activities. She is unable to care for her infant son, drive a car, or concentrate on work. Carlson testified that the headaches last in duration from one to four days. Treatment consists of Carlson taking 800 milligram dosages of Motrin for pain relief and sleeping off the headache. Carlson also testified that she has suffered from migraine headaches since she was in high school, a period of nearly twenty years.

In closing argument the defendant presented reasons why the court should not find a disability. First, the defendant argues that Carlson has presented no independent, empirical evidence to establish that she suffers from migraine headaches. The only documentary evidence of Carlson's migraine headaches are Dr. Domalakes medical notes, which are based upon one appointment with Carlson and whose contents are derived solely from information provided to him by Carlson. Nothing in the ADA mandates that the existence of a disability must be independently proven by a medical test. Dr. Domalakes testified by deposition that he was not aware of any test that could be performed on a patient to verify the presence of a migraine, "other than some rather exotic research type studies that would not be readily available to a practicing physician." Dep. Domalakes 38:2–5, Filing 32. Domalakes further testified that the diagnosis of a migraine headache is made only on patient history. *Id.* 38:6–8.

The defendant also contends that the infrequency in which Carlson sought medical treatment for her migraine headaches—five treatments in twelve years—should preclude me from finding the presence of a disability. The defendant presents no legal authority to support its contention that the frequency in which a plaintiff seeks medical treatment is

or should be a determinative factor in finding that she is substantially limited in a major life activity. Rather, the evidence in this case clearly establishes that the plaintiff's migraine headaches are debilitating and contributed significantly to her unscheduled absences for which she was ultimately terminated. Accordingly, I find that the plaintiff has successfully established the prima facie element of disability.

### B. Qualified Individual

■ Next, the plaintiff must establish that she is a qualified individual with a disability who can perform the essential functions of the job of executive secretary with or without reasonable accommodation. The plaintiff claims that the fact that she performed her job duties competently and efficiently when she was at work establishes that she is a qualified individual with a disability. The defendant contends that regular, predictable attendance is an essential requirement of the executive secretary position. Because Carlson's absences were substantial and unpredictable, the defendant argues that she could not perform the essential functions of the job.

■ Whether a plaintiff is "otherwise qualified" requires a highly fact-sensitive and individualized inquiry, resulting in a case-by-case determination. Generally and broadly speaking, an employee "cannot perform [her] job successfully without meeting some threshold of both attendance and regularity." *Walders v. Garrett,* 765 F.Supp. 303, 309 (E.D.Va.1991), *aff'd,* 956 F.2d 1163 (4th Cir. 1992). While legal authority supports this common-sense conclusion, no legal authority establishes any specific attendance requirements for government or private sector jobs. *Id.* at 310. Rather, the requisite levels of attendance and regularity depend upon the circumstances of each employment position. *Id.* (citing 29 C.F.R. § 1613.702(f) and *School Board of Nassau County, Fla. v. Arline,* 480 U.S. 273, 287–88, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1987)).

I have read the ADA cases supporting the defendant's argument that an essential part of any job is the requirement of regular and predictable attendance. *See Carr v. Reno,* 23 F.3d 525 (D.C.Cir 1994); *Walders v. Garrett,*

765 F.Supp. 303 (E.D.Va.1991), *aff'd,* 956 F.2d 1163 (4th Cir.1992); *Santiago v. Temple Univ.,* 739 F.Supp. 974, 979 (E.D.Pa.1990) *aff'd,* 928 F.2d 396 (3d Cir.1991); *Matzo v. Postmaster Gen.,* 685 F.Supp. 260, 263 (D.D.C.1987), *aff'd,* 861 F.2d 1290 (D.C.Cir. 1988); *Lemere v. Burnley,* 683 F.Supp. 275, 280 (D.D.C.1988); *Wimbley v. Bolger,* 642 F.Supp. 481, 485 (W.D.Tenn.1986), *aff'd,* 831 F.2d 298 (6th Cir.1987). However, my review of these cases reveals that the present case is distinguishable on several grounds.

First, I find that the evidence at trial establishes that Carlson was not excessively absent from her job. On an annual basis, Carlson averaged nine unscheduled absences due to illness, seven of which she testified were due to migraine headaches. While this number of unscheduled absences is not insubstantial, the number of unscheduled absences in no way compares to the weeks and months missed by employees in the above-cited cases.

Secondly, while the defense presented much testimony regarding the time-sensitive, time-critical nature of corporate development business, no evidence was presented to establish that Carlson's absences resulted in essential business not being completed in a timely and efficient manner. The defense produced no evidence of either threatened or actual lost business or profits resulting from Carlson's unscheduled absences. Certainly, Carlson's coworkers were inconvenienced and annoyed by her absences, and customer correspondence may have been postponed for a day or two. Even so, the defense has presented no evidence that Carlson's unscheduled absences were unduly disruptive. *Cf. Dutton,* 859 F.Supp. at 508.

Lastly, I decline to find that attendance is an essential element in this case, because InaCom has no policy on unscheduled absen-

teeism. Testimony by multiple witnesses established that prior to the implementation of the PTO program, no limitation existed on the number of days an employee could acceptably be absent from work due to illness[11]. Once the PTO program was implemented in January 1992, an employee's unscheduled absences became limited only by the number of paid-time-off days allocated to the employee based on his or her length of service.[12]

The InaCom Corporation's Personnel Policies and Procedures Manual, Plt. Ex. 15 & Def. Ex. 110, is void of any absenteeism policy pertaining to unscheduled absences due to illness. The only reference to "illness" occurs in section 40 on page 40.2. The text states:

> InaCom supports the philosophy that each individual should have a regular period of "paid time off" (PTO) from their work for rest and relaxation and for times when their own or a family member's illness should require their absence from the workplace.

Def. Ex. 110, § 40 at p. 40.2. The evidence at trial established that in 1992 Carlson missed 17⅞ days of work. Two of the days were unpaid time off work. Under the PTO plan Carlson was entitled to 16 paid-off days. The record establishes that she did not exceed this allotment of paid-off time.

Given these facts, I decline to make a judicial determination that attendance is an essential element of employment at InaCom, especially when the defendant company has declined to formulate and publish a policy relating to unscheduled absences. Accordingly, I find that Carlson is an otherwise qualified individual with a disability as defined under the ADA.

11. Defense witness Penny Klug and Mike Steffan both testified that InaCom had no policy, written or otherwise, regarding absenteeism during Carlson's employment. Ms. Klug testified that, as the former Director of InaCom's Human Resources Department, if the company had an absenteeism policy, she would have been aware of its existence. As Manager of the Corporate Development Department, Steffan testified that he has never written a policy regarding absenteeism and has never fired an InaCom employee, other than the plaintiff, for absenteeism.

12. Penny Klug testified that after the PTO policy went into effect, she was aware of no company policy of terminating an employee who used all his or her PTO time. Klug testified that it was her understanding that if an employee used all of his or her PTO time, then the employee did not get paid for time away from work.

## C. Reasonable Accommodation

■ Having successfully established that she is disabled and qualified to perform the essential functions of the job, I must next decide whether InaCom's failure to accommodate the plaintiff's unscheduled absences constituted discrimination on the basis of disability. The term "discriminate" includes an employer's not making reasonable accommodations to a known physical limitation of an otherwise qualified individual with a disability who is an employee, unless the employer can demonstrate that the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A). The ADA does not define the term "reasonable accommodation," but the ADA does provide these examples: making employment facilities readily accessible to disabled employees, restructuring a job, providing part-time or modified work schedules, providing modified equipment or devices, reassigning an employee to a vacant position, providing qualified readers or interpreters and other similar accommodations. 42 U.S.C. § 12111(9)(B).

■ In order to be liable for failing to provide a reasonable accommodation Carlson must establish that the defendant had knowledge of her disability. *See Landefeld v. Marion Gen. Hosp. Inc.*, 994 F.2d 1178, 1181 (6th Cir.1993); *Grimes v. U.S. Postal Service*, 872 F.Supp. 668, 675–76 (W.D.Mo.1994); *Hedberg v. Indiana Bell Telephone Co.*, 1994 WL 228184, *4 (S.D.Ind.1994); and *O'Keefe v. Niagara Mohawk Power Corp.*, 714 F.Supp. 622 (N.D.N.Y.1989). The evidence at trial establishes, at best, that management personnel—consisting of Steffan, Friewald, and Klug—knew that Carlson suffered from an occasional headache. The greater weight of the evidence does not show that any of these three individuals knew or should have known that Carlson suffered from a severe, medically diagnosable condition. That a few of Carlson's coworkers may have known that she suffered from migraine headaches is not controlling, because her coworkers were not in a position to offer and provide Carlson with a reasonable accommodation.

Under the ADA an employer is required to accommodate a known disability of a qualified applicant or employee. 42 U.S.C. § 12112(b)(5). The preponderance of evidence at trial established that Carlson never told Steffan or other members of InaCom's management that she had a disability which required an accommodation. During the application process, Carlson did not inform InaCom that she suffered from periodic migraine headaches. When Steffan reprimanded Carlson for her unscheduled absences, she did not explain to Steffan that she suffered from a disability and required an accommodation. When she was terminated for excessive absenteeism, she did not explain to Steffan or Klug that she suffered from a disability and needed an accommodation. Instead, the evidence presented reveals that Carlson did not view her migraine headaches as a disability and failed to request an appropriate accommodation from any employer, past or present.

I find that Carlson has not made a prima facie showing that the defendant failed to provide a reasonable accommodation. Because InaCom did not have sufficient knowledge of Carlson's migraine headaches, InaCom cannot be held liable for failing to attempt a reasonable accommodation.

## D. Disparate Impact/Treatment

■ In order to make out a prima facie case of disparate impact, the plaintiff must show that the defendant's PTO program, although facially neutral, "disparately disadvantages the protected group of which [she] is a member and that [she] is qualified for the position under all but the challenged criteria." *Wimbley v. Bolger*, 642 F.Supp. 481, 483 (W.D.Tenn.1986), *aff'd*, 831 F.2d 298 (6th Cir.1987) (quoting *Prewitt v. USPS*, 662 F.2d 292, 306 (5th Cir.1981)). I find that the plaintiff has offered no evidence to show that the InaCom's PTO program had a disparate impact on disabled employees.

■ Similarly, to establish a prima facie case for disparate treatment, the plaintiff must show that she was treated differently from others because of her disability. *Wimbley*, 642 F.Supp. at 484 (citing *Prewitt v. USPS*, 662 F.2d at 305, n. 19). Although during trial Carlson hinted that other InaCom employees with comparable absenteeism records have not been terminated, she

has presented no evidence to show that she was treated differently from any other Ina-Com employee under the PTO program. Therefore, she has failed to make out a showing of a disparate treatment based on disability.

### III. CONCLUSION

For the foregoing reasons, I find that the plaintiff has failed establish that the defendant discriminated against her on the basis of disability. Accordingly, judgment is to be entered for the defendant.