896 F.Supp. 816 (1995)
Debrah K. HENDRY, Plaintiff,
v.
GTE NORTH, INC., Defendant.
No. 1:95-CV-4.
United States District Court, N.D. Indiana, Fort Wayne Division.
August 17, 1995.
*817 *818 Christopher C. Myers, Myers and Geisleman, Fort Wayne, IN, for plaintiff.
Thomas W. Belleperche, Hunt, Suedhoff, Borror and Eilbacher, Fort Wayne, IN, for defendant.

MEMORANDUM OF DECISION AND ORDER
COSBEY, United States Magistrate Judge.

I. INTRODUCTION
This matter is before the Court[1] on the motion of the Defendant, GTE North, Inc. *819 ("GTE"), for summary judgment filed June 21, 1995. On July 6, 1995, the Plaintiff, Debrah K. Hendry ("Hendry"), filed a memorandum in opposition. On July 17, 1995, GTE filed its reply.
The record before the Court consists of deposition excerpts, affidavits, and the stipulated medical records of Hendry.
For the reasons hereinafter provided, the motion for summary judgment will be GRANTED in part and DENIED in part.

II. FACTUAL AND PROCEDURAL BACKGROUND
On January 3, 1995, Hendry filed her complaint,[2] alleging race discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; disability discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, et seq.; and a violation of the Family Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, et seq. Hendry in her response brief acknowledged that she does not have a race discrimination claim, and the Court will grant summary judgment accordingly. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(4).
Before her termination on February 24, 1994, Hendry had been a long-time GTE employee, having commenced employment on October 15, 1973. However, the critical period for our purposes only involves the last three years of her employment. It was during that period of time that Hendry started suffering from migraine headaches. See, Hendry Dep., p. 17.
At least during this initial period of time, Hendry was supervised by JoAnn C. Kaley ("Kaley"), a supervisor of the "repair answer center and customer billing center." See, Kaley Aff., ¶ 3. Hendry viewed Kaley as a sympathetic supervisor, and one who would accommodate her needs and absences.
Nevertheless, GTE has an annual attendance expectation and standard of two percent (2%). Kaley Aff. ¶ 11. GTE does not specifically allocate personal days or sick days in their absenteeism policy. Hendry Dep. errata sheet, p. 28. Rather, only "time off arranged at the mutual convenience of management and hourly employees" is excluded from the computation.[3]See, Exh. 1 to Hendry Aff. GTE's policy, with respect to disciplining employees who have absenteeism problems, is: first, a verbal warning; second, a written warning; third, suspension; and finally, termination. See, Kaley Aff., ¶ 4.
By 1993, Hendry's absenteeism rate at GTE, as documented by Kaley, exceeded the company's standard. See, Exh. A. to Kaley Aff. In fact, Hendry received two (2) written warnings in both February and May, 1993, and ultimately received a three (3) day suspension without pay in June, 1993. Id. The written suspension letter told Hendry: "your absences far exceed the Company's expectation and standard of two percent (2%) or less."
Nonetheless, there would be times when Hendry's attendance would improve  such that she would meet the two percent (2%) standard. See, Exh. 3C to Hendry's Aff. (showing a 1.7% hourly absenteeism rate as of April 19, 1993).
Ultimately, in late 1993, the operation in which Hendry was working was closed by GTE, and she was transferred to a different department under the supervision of Dan Thornburg ("Thornburg"), a long-time GTE supervisor. See, Thornburg Aff. ¶ 2-4. Hendry thus assumed, on January 3, 1994, the position of "service clerk" in Thornburg's department. Id. The service clerk position in that department had four (4) basic functions that had to be performed on a daily basis. Id. at ¶ 5.
*820 By this time, Hendry's migraine headaches (caused apparently by stress and tension) had become both more frequent and severe. Hendry Dep., p. 17. Id. The migraines started in approximately 1991, and had a frequency of three (3) to four (4) times per week. Id. at 30-31. By the time she transferred to Thornburg's department, however, they were occurring daily. Hendry Dep., p. 31. Some days the headaches were so severe that Hendry could not work; other days the headaches were less severe and she could work. Id. at 32. When they occurred, the headaches would make her feel nauseous, she could not eat or drink, and it would affect her equilibrium to such an extent that she felt like she was going to fall and needed to be assisted out of bed. Id. at 32. She also had severe sensitivity to light, and could not drive. Hendry Dep., errata sheet p. 32. On several occasions she vomited at work, and customer voices sounded "fuzzy and muffled" such that customers had to repeat themselves. Id.
Hendry claims that her symptoms depended on her medication, which kept changing. Id. at 31. The medication would initially help, but ultimately "it wouldn't work ... any longer." Id. at 31.
Nonetheless, Hendry claims that during this period of time, her supervisors, at least until she ended up in Thornburg's department, accommodated her migraine headaches. For example, a supervisor would allow her to leave for doctor appointments, and after the appointment, make up the time missed. Hendry Dep. errata sheet p. 28. At other times, she was permitted to go to a separate room and lay down. Hendry Dep., p. 30. However, most of all, Hendry claims that prior supervisors accommodated her by letting her use vacation days for missed work. Hendry Dep., pp. 27, 29-30. Hendry was allowed four (4) weeks of vacation a year. Id. at 29.
However, this changed when she went to Thornburg's department, because he would apparently not allow Hendry to use vacation days for her migraine headache absences. Hendry Dep., p. 25. Nonetheless, during the first two (2) weeks that Hendry was working in Thornburg's department, she was on vacation. See, Exh. 4 to Hendry Aff. Hendry knew, however, that it was up to the supervisor's discretion whether she would be allowed to take accumulated vacation days. See, Hendry Aff. ¶ 4, Hendry Dep., pp. 28-29. At any rate, after transferring to Thornburg's department, one of the accommodations previously shown to Hendry by her supervisors (allowing her to take vacation time off for her migraine headaches) ended. See, Hendry Aff. ¶ 6.
After the first two (2) weeks of her January, 1994 vacation, Hendry still missed work. After she started her vacation, Hendry received an extension of it to January 17, 1994. Thornburg Aff. ¶ 8. On January 18, 1994, Hendry requested time off because of an illness[4] and this was also apparently counted as vacation time. See, Exh. 4 to Hendry Aff. See, Exh. 4 to Hendry Aff. It was during this time that GTE had made arrangements for Hendry's predecessor (and indeed, her trainer) to be working in Thornburg's department. See, Thornburg Aff. ¶ 6.
On January 20, 1994, and after Hendry reported to work, Thornburg spoke to Hendry about the importance of her attendance and that she was now holding a "one-person operation"; i.e., that she was the only one in the department who performed the four functions that must be performed by the "service clerk" on a daily basis. Thornburg Aff. ¶¶ 5, 10. Nevertheless, after this counseling session Hendry missed work again on January 24 and 25, 1994, although the time was counted as excused absences.[5]See, Exh. 4 to Hendry Aff. On January 26, 1994, Hendry reported to Thornburg that she was quitting GTE. See, Thornburg Aff. ¶ 13. Later that same day she asked that her *821 resignation be rescinded. Id. at ¶ 14. Thornburg, at approximately 6:00 p.m. that day (after attempting to contact Hendry on a number of occasions during the day), phoned to tell her that her resignation was rescinded, but warned her that if she missed one more day before her attendance rate was at or below two percent (2%), it would result in her termination. See, Thornburg Aff. ¶ 15 and Exh. A, p. 4.[6] When she arrived for work on January 27, 1994, (thus indicating that she was not quitting) Hendry was again counselled about her attendance. See, Thornburg Aff. ¶ 16. In fact, Hendry was given a five (5) day suspension and a discipline letter was read to her. See, Exh. A to Thornburg Aff.[7] By GTE's measure, this was the last discipline measure to be taken prior to termination. See Kaley aff. ¶ 4.
Ultimately, on February 23, 1994, Hendry missed another day of work, reportedly for a migraine headache. See, Exh. A to Thornburg Aff. On February 24, 1994, Thornburg placed her on "indefinite suspension pending further investigation" and on March 7, 1994, she was terminated effective February 24, 1994. See, Thornburg Aff. ¶ 19. At the time that Hendry was terminated, her absenteeism occurrence rate was 2.89% (7 occurrences), and her absence rate was 9.64% (192 hours). Thornburg Aff. ¶ 18. Hendry does not contest this calculation.
Hendry claims that Thornburg and GTE should have continued to accommodate her (i.e., by telling her to use vacations days as sick days) until she found the medication that she needed. See, Hendry Dep., p. 34. However, Hendry recognizes that this accommodation could not have gone on indefinitely, particularly since eventually it would have consumed all of her vacation days. Id. In fact, at the time she left GTE, none of the medications she had tried had controlled her migraines. See, Hendry Aff. ¶ 3.[8] In short, Hendry feels that she "should have been treated better." Hendry dep. p. 34.
On the other hand, GTE makes the point that regular attendance was an essential part of Hendry's job duties, and that when she was absent without prior notice the department could not function normally. Moreover, having another employee perform Hendry's functions was burdensome; indeed, there were no other trained service clerks in Thornburg's department.[9] Thornburg Aff. at ¶ 21.
Hendry claims that she was not told about the FMLA, and she cannot say whether there was any posting about it in her workplace. Hendry Dep., pp. 53-54. Nonetheless, a notice about the FMLA and information pertaining to filing charges under it has been conspicuously posted at least somewhere at GTE. See, Scudder Aff. ¶ 3.
More facts may be discussed along the way, but first, a discussion of summary judgment principles is necessary.

III. SUMMARY JUDGMENT STANDARD
Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. Fitzpatrick v. Catholic Bishop of Chicago, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, *822 and in which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252, 106 S.Ct. at 2512; In re Matter of Wildman, 859 F.2d 553, 557 (7th Cir.1988); Klein v. Ryan, 847 F.2d 368, 374 (7th Cir.1988); Valentine v. Joliet Township High Sch. Dist. No. 204, 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 322 (7th Cir.1992) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).
Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. Goka v. Bobbitt, 862 F.2d 646, 649 (7th Cir.1988); Guenin v. Sendra Corp., 700 F.Supp. 973, 974 (N.D.Ind.1988); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir.), cert. denied, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. Anderson, 477 U.S. at 249-251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir.1983).
Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. Anderson, 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. Id. The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586, 106 S.Ct. at 1356; First Nat'l Bank of Cicero v. Lewco Sec. Corp., 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. Id. A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251-252, 106 S.Ct. at 2512.
In any event, in employment discrimination matters, the standard on summary judgment is applied with "added rigor." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1038 (7th Cir.1993). The Seventh Circuit recently reiterated this standard in Robinson v. PPG Industries, Inc., 23 F.3d 1159, 1162 (7th Cir.1994), 1994 WL 167831, * 3 citing the standard set out in Sarsha:
Summary judgment is appropriate only when the materials before the court demonstrate that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues. Accordingly, we will affirm the decision of the district court only if, had the record *823 before that court been the record of a complete trial, the defendant would have been entitled to a directed verdict.[10] [citations omitted].

IV. DISCUSSION

A. The ADA Claim.
The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual ... [.]" 42 U.S.C. § 12112(a). The ADA prohibits an employer from discriminating against such persons with regard to "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Id. The term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. 12112(b)(5)(A).
A disability is "(A) a physical or mental impairment that substantially limits one or more of the life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions" of the job. 42 U.S.C. § 12111(8). The employer's duty to provide reasonable accommodations does not extend, however, to accommodations that "would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).
Initially, however, the Plaintiff has the burden to establish that she is "disabled" and "qualified" to perform the essential functions of the job, either with or without reasonable accommodation, Dutton v. Johnson County Bd. of County Comm'rs, 859 F.Supp. 498, 504 (D.Kan.1994); the burden of production then shifts to the defendant either to rebut those claims, or to establish that the reasonable accommodation required would create an undue hardship. Id. at 505; Carlson v. InaCom Corp., 885 F.Supp. 1314, 1319 (D.Neb.1995).
Although their initial brief was somewhat cryptic, it is clear that GTE is arguing that Hendry is not disabled within the meaning of the ADA, see GTE reply brief pp. 2-6; and that she is not a "qualified individual" under the ADA because her record of absenteeism precludes her from performing the essential functions she has been assigned in her department, see, GTE reply brief pp. 6-11. Finally, GTE argues that if they had accommodated Hendry as she suggests, that it would have imposed an undue hardship on Thornburg's department.

1. Plaintiff's Disability.
GTE argues that intermittent migraine headaches do not fit the statutory definition of disability, in that the Hendry has failed to show that her headaches stemmed either from a physiological disorder or that they contributed significantly to her absenteeism.
Hendry claims that she is disabled by reason of "a physical or mental impairment that substantially limits one or more of [her] life activities." 42 U.S.C. § 12102(2). The regulations define "physical or mental impairment" as "[a]ny physiological disorder, or condition" affecting one or more of the various body systems, including the cardiovascular system. 29 C.F.R. § 1630.2(h)(1). "Major life activities" are the basic activities that the average person can perform with little or no difficulty, e.g., "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).
"Substantially limits" is defined as either the inability to perform a major life activity, or a serious restriction on the ability to perform a major life activity as compared to an average person in the general population. 29 *824 C.F.R. § 1630.2(j)(1). In considering whether a person's impairment substantially limits a major life activity, the Court should consider: (1) its nature and severity, (2) how long it will last or is expected to last, and (3) its permanent or long-term impact, or expected impact. 29 C.F.R. § 1630.2(j)(2).
"An individual is substantially limited in working if the impairment restricts the person's ability to perform either a class of jobs or a broad range of jobs in various classes." Dutton, 859 F.Supp. at 505 (citing Byrne v. Bd. of Educ., 979 F.2d 560, 565 (7th Cir. 1992). "An impairment that limits an individual's ability to perform only one job fails the test of substantial limitation in working." Id. In addition, the following factors should be considered when determining whether an individual is substantially limited in working: (1) the type of job from which the individual has been disqualified because of impairment; (2) the number and types of jobs within that area from which the individual is disqualified; (3) the number and types of jobs using similar training, knowledge, skill, or abilities from which the individual is disqualified; and (4) the number of and types of other jobs in the area from which the individual is also disqualified. 29 C.F.R. § 1630.2(j)(3).
The evidence shows that Hendry's headaches constitute a physiological disorder which affects her neurological and cardiovascular system. See Shah letter of June 4, 1993 (stipulated medical exh. 2) Cf. Dutton, 859 F.Supp. at 506; Carlson, 885 F.Supp. at 1320. The record reflects that when she gets a migraine headache, it can be both severe and debilitating. Hendry Dep., p. 32 and Hendry Dep. errata sheet, p. 32. In fact, the symptoms described by Hendry are remarkably similar to those suffered by both plaintiffs in Dutton and Carlson. Id. For example, when Hendry gets a migraine headache, she is not able to drive a car, eat or drink, and on several occasions in the past, she vomited at work. Id. Her equilibrium would also suffer, such that she could not get out of bed or stand. Id. Her symptoms would be controlled only intermittently through medication. Id. Thus, on this record, a question of fact exists as to whether Hendry was limited in a major life activity, i.e., working. Dutton, 859 F.Supp. at 506, Carlson, 885 F.Supp. at 1320. The evidence Hendry has presented goes on to show that Hendry's headaches contributed significantly to her unscheduled absences for which she was ultimately terminated. Carlson, 885 F.Supp. at 1320.[11]
While GTE argues that Hendry's headaches are relatively infrequent, "intermittent" within the meaning of Vande Zande v. State of Wis. Dep't of Admin., 44 F.3d 538, 544 (7th Cir.1995), that is not the true state of the record if Hendry is to be believed. In fact, Hendry claims that towards the end, her migraine headaches were occurring three (3) to four (4) times a week and, by the time she was transferred to Thornburg's department, daily. See, Hendry Dep., p. 31.
Hendry's status as a disabled individual "is a highly fact-sensitive issue, requiring an individualized inquiry and case-by-case determination." Dutton, 859 F.Supp. at 506 (citing Byrne, 979 F.2d at 565). Thus, on this issue, GTE has not established the absence of a genuine issue of material fact to show that Hendry is not disabled.
A facially similar case exists in the form of Barfield v. Bell South Telecommunications, Inc., 886 F.Supp. 1321 (S.D.Miss.1995). In Barfield, a telephone company employee was terminated for excessive absenteeism, which she claimed was attributable to headaches. However, in granting summary judgment, the District Court found that she was not disabled because she failed to present evidence substantiating her contention that she suffers from "migraine headaches"; in fact, she submitted no proof as to either the frequency *825 or the duration of the headaches, and thus had no proof to support a finding that her impairment substantially limited a major life activity. Id. at 1324-25. Moreover, the evidence presented in Barfield demonstrated that the plaintiff could perform other jobs at work when she was suffering from a headache. Id. at 1325. In contrast here, Hendry suggests that when she suffered from a migraine headache (with both the frequency and intensity increasing after she transferred to Thornburg's department), she was precluded from doing any work. Thus, while Hendry had migraines everyday, she could still periodically perform some work; yet, it has still not been shown what work Hendry could do at GTE when she was suffering from one of these lesser migraines. This too remains an issue of fact.

2. Qualified Individual
Next, Hendry must either establish, or raise an issue of fact about, whether she was a qualified individual with a disability who could perform the essential functions of her job at GTE with or without reasonable accommodation. 29 C.F.R. § 1613.702(f). Such a person is "one who is able to meet all of the program's requirements in spite of [her disability]." Walders v. Garrett, 765 F.Supp. 303, 309 (E.D.Va.1991), aff'd, 956 F.2d 1163, 1992 WL 38168 (4th Cir.1992). Thus, the issues become: was reasonable regular attendance an essential function of Plaintiff's position; and, could Hendry maintain such attendance with or without reasonable accommodation?

a. Regular Attendance as an Essential Job Function.
Many courts have held, both under the Rehabilitation Act and the ADA, that employees who are disabled cannot prove that they can adequately perform the essential functions of a job without a showing that they can maintain a regular and dependable level of attendance at that job. Barfield, at 1326 (collecting cases). In fact, regular attendance at work is an essential function of virtually all jobs. Id.
Hendry does not really contest the fact that regular and predictable attendance was an essential element of the position of service clerk in Thornburg's department. Rather, she chooses to list some "reasonable accommodations" that she believes GTE could have extended to her that would have allowed her to perform the service clerk position.
Nevertheless, before skipping ahead to that second component, it should be observed that the service clerk position in Thornburg's department falls within the general rule  regular attendance was a necessary element of the job. See, Walders, 765 F.Supp. at 309-10. It is undisputed that the service clerk job in Thornburg's department required four (4) basic functions that needed to be done on a daily basis. In fact, when Hendry's absenteeism surfaced shortly after her transfer to Thornburg's department, he explained to her that she was a "one-person operation," meaning that she was the only service clerk in the department and the only one who could perform these necessary functions, i.e., the receipt of work orders, the administration of them, the distribution of the orders within the department, and the logging of the information into the central office database. See, Thornburg Aff. ¶¶ 5, 10. Regular attendance is an essential part of the service clerk's duties and unscheduled absences meant that the department could not function normally, all with resulting "undue hardship" to Thornburg's department.[12]See, Thornburg Aff. ¶¶ 20-21.
By the time, Hendry was ultimately terminated, she had exhibited excessive and random attendance far beyond GTE's attendance expectations and policy. In fact, when *826 she was terminated, both her occurrence rate, and absence rate, exceeded company standards. Indeed, her absence rate was more than four (4) times the allowed measure. See, Thornburg Aff. ¶ 18. In fact, with vacation time (which did not count towards absences) Hendry had been absent more than 300 hours within the year prior to her termination  amounting, of course, to approximately eight (8) weeks of absences. This high level of unpredictable absenteeism thus prevented Hendry from performing the essential functions of her job at a satisfactory level of productivity. Walders, 765 F.Supp. at 312.
What is left then is the second prong of what it means to be a "qualified individual," 42 U.S.C. § 12111(8): was there any reasonable accommodation that GTE could have made that would have enabled Hendry to perform her job satisfactorily, notwithstanding her disability?

b. Reasonable Accommodation.
The term "discrimination" includes an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer's] business." 42 U.S.C. § 12112(b)(5)(A).
The term "undue hardship" is defined as "an action requiring significant difficulty or expense." 42 U.S.C. § 12111(10)(A). In determining whether an accommodation would impose an undue hardship, the Court is to consider the nature and cost of the accommodation needed; the number of persons employed at the facility; and the impact of the accommodation upon the operation of the facility. See, 42 U.S.C. § 12111(10)(B)(i), (ii).
At the outset, however, it is Hendry who has the burden of showing that she is a qualified individual with a disability and, thus, she bears the burden of demonstrating that she could perform the essential functions of her job with reasonable accommodation. Walders, 765 F.Supp. at 312.
Hendry argues essentially that she could have performed the service clerk position if only Jan McDowell, the prior service clerk in Thornburg's department, could have relieved her from time to time, see Hendry's reply brief, p. 9; if she had been allowed to use vacation days as sick days as in the past, id. at 10; and if GTE had simply investigated Hendry's situation and had accommodated her until she found the medication necessary to correct her problem, see id. p. 9.
The problem with the notion that GTE should have substituted Jan McDowell on those days when Henry was ill was the fact that McDowell worked for a different GTE division and had her own work to perform. See, Thornburg Suppl.Aff. ¶ 4. While it is true that McDowell was present in January 1994 to train Hendry, she was only temporarily "on loan" for that purpose. See, Thornburg Aff. ¶ 6. Moreover, Hendry does not contest that the service clerk position was the linchpin for the smooth operation of Thornburg's department. In fact, the service clerk position was essentially a "one-person operation" and Hendry was the only person in the department who performed those necessary functions. Thornburg Aff. ¶ 10. Moreover, the service clerk operated under some time constraints  her essential functions needed to be performed daily. Id. at ¶ 5. The upshot of this is that Hendry needed to pull her own weight; she could not expect GTE to require other employees to substitute for her during her frequent and unpredictable absences. See, Walders, 765 F.Supp. at 313-14.
Hendry's situation is different than what existed in either Carlson or Dutton, two cases where the work that each employee was doing was relatively interchangeable  other employees could easily step in and perform the qualified individual's tasks, resulting in no undue disruption to the business. See, Carlson, 885 F.Supp. at 1316; Dutton, 859 F.Supp. at 508. Here, Hendry's absences were unduly disruptive to GTE's operation. Thornburg Aff. ¶¶ 20-21; see, Appendix to 29 C.F.R. § 1630.2(p) ("Undue hardship" refers to any accommodation that would be unduly costly, extensive, substantial, or disruptive, or that would fundamentally alter the nature or operation of the business."). In short, GTE had no substitutes *827 readily available if Hendry unpredictably became sidelined.
For these same reasons, allowing Hendry to use vacation time for sick leave was also not a reasonable accommodation. In Walders, the plaintiff also asked for a flexible schedule to include taking unscheduled leave when needed. As the court there observed, "[I]n essence, the accommodation the plaintiff seeks is simply to be allowed to work only when her illness permits." 765 F.Supp. at 313. As in Walders, Hendry's situation would work an undue hardship on her employer. This is particularly true given that Hendry's illnesses were more frequent than even her generous vacation allowance would accommodate. Thus, it would appear that Hendry would inevitably exceed her vacation time allowance if it were allowed to be consumed as sick leave.[13]
Finally, while Hendry claims that medication has now controlled her migraines, that was not the case when she worked at GTE. GTE was not obligated to continue to allow Hendry unpredictable absences, particularly given her history of prior medication failures. See, (Hendry Dep., p. 31).
As a result of the foregoing, Hendry has failed to demonstrate that she could have performed the service clerk position with reasonable accommodation, Barfield at 1327, and the accommodations she proposes would have worked an undue hardship on GTE. Walders, 765 F.Supp. at 313-14.
For the foregoing reasons, summary judgment will be granted to GTE on the ADA claim.

B. The FMLA Claim.
GTE simplistically argues in its brief, and again in its reply brief, that Hendry does not have a claim under the FMLA because she was terminated because her absenteeism rate exceeded GTE's standards and expectations and not because she suffered from migraine headaches. See, GTE's brief, pp. 13-14 and reply brief, pp. 11-12.[14]
The FMLA provides that "an eligible employee shall be entitled to a total of twelve (12) work weeks of leave during any twelve (12) month period for one or more of the following: ... (D) because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(1). The term, "serious health condition" is defined under the FMLA as "an illness, injury, impairment or physical or mental condition that involves  ... (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The applicable regulations, interpreting the FMLA, further refine the term "continuing treatment" as including instances where the employee "is treated two or more times for the injury or illness by a health care provider." 29 C.F.R. § 825.114(b)(1).
On this record, there is at least an issue of fact raised as to whether Hendry's condition gave rise to a "serious health condition." For example, it would appear that she was receiving "continuing treatment" for migraines from her doctor, and that this continued through the latter half of 1993 and certainly on more than two (2) occasions. See, Plaintiff's Exh. 4.
Moreover, the record suggests that when Hendry suffered from migraine headaches, she was "unable to perform the functions" of her job. See, Hendry Dep., p. 32. 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. § 825.112(a)(4); 29 C.F.R. § 825.115. Indeed, an inference has been raised on this record that her health care provider was of the opinion that she was unable to perform the essential functions *828 of her position, or to work at all, while suffering from migraine headaches. See, Plaintiff's Exh. 4.[15]
Under the Act, Hendry was entitled to intermittent leave "when medically necessary." 29 U.S.C. § 2612(b)(1); 29 C.F.R. § 825.203(a). "Intermittent leave" can be taken in separate blocks of time and may include periods "from an hour or more to several weeks." 29 C.F.R. § 825.203(b). There would thus appear to be no question that Hendry asked for "intermittent leave" on certain occasions, and it remains an issue of fact as to whether said leave was "medically necessary." See, 2-28-94 note from Hendry's health care provider.
When she was terminated on February 24, 1994 (as a result of being absent on February 23, 1994) it was because she reported herself ill with a migraine headache. See, Exh. A to Thornburg Aff. An employee seeking FMLA leave is to "provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave. The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed ...[.]" 29 C.F.R. § 825.302(c). Hendry arguably complied with this requirement when she reported her illness on February 23, 1994. At that point, the employer had a responsibility to inquire further of Hendry about whether FMLA leave was being sought and to obtain the necessary details of the leave to be taken. Id. However, while Hendry had been told that she could not use vacation days for sick leave, she had never been informed about the possibility of taking FMLA leave. See, Hendry Dep., p. 53. In fact, given Mr. Thornburg's attitude, it is likely that a leave request on any basis would have been denied. See, Hendry Aff. ¶ 6; Hendry Dep., pp. 24-25.
Nonetheless, Hendry cannot recover damages for GTE's failure to post a notice regarding the FMLA because the Act only provides for a civil money penalty for an employer's failure to comply with the posting requirement.[16] 29 U.S.C. § 2619(b); 29 C.F.R. § 825.300(b) ("An employer that willfully violates the posting requirement may be assessed a civil money penalty by the Wage and Hour Division not to exceed $100 for each separated offense."). The civil money penalty cause of action belongs to the Secretary of Labor. 29 C.F.R. § 825.404. However, the regulations do provide that a nonposting employer is estopped from taking adverse action against an employee who fails "to furnish the employer with advance notice of a need to take FMLA leave." 29 C.F.R. § 825.300(b). Thus, if GTE has not properly posted the notice, they may now be estopped from asserting that Hendry failed to furnish them proper advance notice of her need to take FMLA leave.

V. CONCLUSION
As a consequence of the foregoing, material issues of fact remain that preclude the granting of summary judgment on the FMLA claim.[17] Based on the foregoing, the Defendant's motion for summary judgment is GRANTED as to the ADA claim, and DENIED as to the FMLA claim. Summary judgment is GRANTED on Hendry's race *829 claim.[18]
NOTES
[1] Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.
[2] The complaint was later amended to show that the name of the proper party defendant was GTE North, Inc.
[3] This two percent standard was a "rolling" one; which meant that an employee was not to have more than approximately forty (40) hours of absences within the preceding year. Vacation time "arranged at the mutual convenience of management and the hourly employee" was not included in the calculation. See, Exh. 1 to Hendry's Aff.
[4] Thornburg says he was told it was because of "lower back pain." See, Thornburg Aff. ¶ 9.
[5] Thornburg indicates that Hendry reported that her daughter was ill. See, Thornburg Aff. ¶¶ 11-12. This was contemporaneously confirmed by Hendry herself. See Thornburg supplemental aff. ¶ 2. However, Hendry's doctor later reported (after Hendry had already been placed on indefinite suspension for absenteeism) that she missed work on those days because of migraine headaches. See Stipulated medical Exhibit 4.
[6] January 26, 1994, was shown as an excused absence on Hendry's attendance record. See, Exh. 4 to Hendry Aff.
[7] The dates of suspension were shown as excused absences on Hendry's attendance record. See, Exh. 4 to Hendry's Aff.
[8] Hendry now claims that she has medications that have been effective in controlling the severity of her headaches. Id. Notably, however, she says nothing about whether the medications have been effective in controlling the frequency of the headaches.
[9] By February, 1994, the prior service clerk was no longer temporarily assigned to Thornburg's department. See, Thornburg Aff. ¶ 6. See, Thornburg Suppl.Aff. ¶ 4.
[10] The anachronistic term "Directed Verdict" is no longer used; rather, it has been more accurately retitled "Judgment as a Matter of Law." See Fed.R.Civ.P. 50(a). A defendant is entitled to such a judgment if "there is no legally sufficient evidentiary basis for a reasonable jury to find for" the plaintiff. Id.
[11] While GTE argues that there is no evidence that Plaintiff's headaches contributed significantly to her absenteeism, a material issue of fact is created by Hendry's own testimony. See, Hendry Dep., p. 16. In fact, Hendry attributes her "occurrences", which she concedes were "sky high," to her "extreme migraine headaches." Id. Hendry also reported to GTE that her absences were attributable to migraine headaches. Hendry Dep., pp. 44-45. Moreover, there does not seem to be much dispute that at least prior to her termination, Hendry was being treated for migraine headaches. See, Stipulated medical Exh. 4. Thus, it can reasonably be inferred that Hendry's headaches contributed significantly to the absenteeism for which she was terminated.
[12] The record does not reveal whether Hendry's prior service clerk position, in another department, also required regular predictable attendance. However, when that department closed, and Hendry transferred to Thornburg's department, it became clear that this new job required regular predictable attendance, and that Thornburg would expect it. It also became apparent that Thornburg was a stickler about GTE's well-known two percent (2%) attendance policy. See Hamm v. Runyon, 51 F.3d 721, 723 (7th Cir. 1995). This further illustrates that regular, predictable attendance was valued at GTE. Cf. Carlson, 885 F.Supp. at 1321 ("I decline to find that attendance is an essential element ... because [the company had] no policy on unscheduled absenteeism").
[13] Hendry apparently took the first two (2) weeks of January of every year as vacation anyway. See, Exh. 4 to Hendry's Aff. Thus, taking vacation time for vacation purposes only exacerbated the problem  there was little "vacation time" left to be taken as sick leave.
[14] In its reply brief, GTE makes the surprising statement that "the Plaintiff has not established that she has suffered from migraine headaches since 1991." See, reply brief, p. 11. However, Hendry's deposition and the medical records submitted (plaintiff's exhibit 4) clearly show that Hendry suffered from migraine headaches in the years prior to her termination, and afterward.
[15] In particular, Hendry's family physician wrote on February 28, 1994, "this patient was disabled and not able to work on 1-24, 1-25, 1-26, and 2-23-94; she was under my care for a migraine headache."
[16] The Scudder affidavit is ambiguous as to where the FMLA notice is posted within the GTE organization. Scudder merely relates that it is posted in a "conspicuous place" (Scudder Aff., ¶ 3), but GTE is a large facility, with a number of buildings, and the notice may not have been posted so that Hendry or others working in her area would have seen it. After all, the regulations provided that FMLA notices are to be posted "in conspicuous places where employees are employed ...[.]" 29 C.F.R. § 825.300(a).
[17] It is undisputed that GTE is an "employer" within the meaning of the FMLA, inasmuch as it "engaged in commerce or in any industry or activity affecting commerce" and "employed fifty (50) or more employees for each working day during each of twenty (20) or more calendar work weeks" during the appropriate time frame. 29 U.S.C. § 2611(4).
[18] GTE's motion for oral argument is denied. Oral argument would not have added to the Court's understanding of the issues.